ENTERPRISE ASSOCIATION OF STEAM, HOT WATER, HYDRAULIC SPRINKLER, PNEUMATIC TUBE, ICE MACHINE AND GENERAL PIPEFITTERS OF NEW YORK AND VICINITY, LOCAL UNION NO. 638 OF the UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 73–1764.

United States Court of Appeals, District of Columbia Circuit.

Argued June 13, 1974.

Decided July 1, 1975.

Petition to Review and Cross-Application to Enforce an Order of the National Labor Relations Board.

Martin R. Ganzglass, Washington, D. C., for petitioner. Ernest Fleischman, New York City, was on the brief for petitioner.

Jay E. Shanklin, Atty., N. L. R. B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., were on the brief for respondent.

Gerard C. Smetana, Chicago, Ill., Milton A. Smith, Richard B. Berman and Alan Raywid, Washington, D. C., filed a brief on behalf of the Chamber of Commerce of the United States of America as amicus curiae.

Vincent J. Apruzzese and Francis A. Mastro, Springfield, N. J., filed a brief

on behalf of Public Service Electric & Gas Co. and American Cyanamid Co. as amici curiae.

Kenneth C. McGuiness and Robert E. Williams, Washington, D. C., filed a brief on behalf of Air-Conditioning and Refrigeration Institute and others as amici curiae.

Patrick C. O'Donoghue, Donald J. Capuano, and Roger C. Hartley, Washington, D. C., filed a brief on behalf of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO as amicus curiae.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

J. SKELLY WRIGHT, Circuit Judge:

We are required by this case to review once again the National Labor Relations Board's "right to control" test for determining whether a union has engaged in secondary activity proscribed by Section 8(b)(4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B) (1970).[1] The Board found that the petitioner union, Enterprise Association, had violated Section 8(b)(4)(B) by directing member steamfitters to refuse to comply with their employer's instruction to install prefabricated climate control units. Although the Board specifically determined that the refusal "was for the purpose of preserving work [the steamfitters] had traditionally performed,"[2] the Board nevertheless held it to be secondary activity because the steamfitters' employer did not have the legal right to control assignment of the work which the union was attempting to preserve.

We have held in two previous decisions, *Local 742, Carpenters v. NLRB,* 144 U.S.App.D.C. 20, 444 F.2d 895, *cert. denied,* 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971), and *Local 636, Plumbers & Pipefitters v. NLRB,* 139 U.S.App.D.C. 165, 430 F.2d 906 (1970), that the right to control test misconstrues Section 8(b)(4)(B) as interpreted by the Supreme Court in *National Woodwork Manufacturers Assn. v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Despite the fact that at least four of our sister circuits have similarly rejected the Board's position,[3] the Board has nevertheless stead-

---

1. Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B) (1970), provides:

 (b) It shall be an unfair labor practice for a labor organization or its agents—

 \* \* \* \* \* \*

 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

 \* \* \* \* \* \*

 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

2. Joint Appendix at 254.

3. *See NLRB v. Local 164, IBEW,* 388 F.2d 105, 107–10 (3d Cir. 1968); *American Boiler Mfrs. Assn. v. NLRB,* 404 F.2d 556, 561 (8th Cir. 1968); *Beacon Castle Square Bldg. Corp. v. NLRB,* 406 F.2d 188, 192 n.10 (1st Cir. 1969)

fastly persisted in applying its test. The Board's recent attempt to provide an acceptable rationale for its approach and to explain how the disputed test is consistent with the analysis of *National Woodwork, supra,* has now been approved by the Fourth Circuit in *George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (1973). We have reconsidered the right to control test in light of the Board's rationalization in *Koch,*[4] but we continue to adhere to our previous holdings that the test impermissibly expands the congressionally intended scope of Section 8(b)(4)(B).

## I

Petitioner Enterprise Association, a plumbing and pipefitting union, has for many years negotiated a collective bargaining agreement with Hudik-Ross Company, a firm engaged in the business of heating, ventilating, and air conditioning contracting. The agreement which was effective during the period of the union's allegedly secondary activity contained a provision, Rule IX, which obligated Hudik-Ross to have its employees "cut and thread internal piping in climate control units" which Hudik-Ross contracted to install.[5] This cutting and threading was work traditionally performed by employees in the bargaining unit.

The Austin Company is the general contractor and engineer for construction of the Norwegian Home for the Aged in Brooklyn, New York. In January 1972, as a result of competitive bidding, Hudik-Ross was awarded a subcontract to provide the heating, ventilation, and air conditioning work for the Norwegian Home construction. This subcontract incorporated Austin's specifications that certain heating and air conditioning units manufactured by Slant/Fin Corporation would be installed in the Norwegian Home. The specifications clearly

(dictum); *Western Monolithics Concrete Products, Inc. v. NLRB,* 446 F.2d 522, 526 (9th Cir. 1971). The Second Circuit has also employed an analysis of § 8(b)(4)(B) which is inconsistent with the right to control doctrine. *NLRB v. Local No. 28, Sheet Metal Workers,* 380 F.2d 827, 830 (1967). *See also Danielson v. Painters Dist. Council No. 20,* 305 F.Supp. 1108, 1113–17 (S.D.N.Y. 1969) (dictum) (denying § 10(*l*) preliminary injunction). Law review commentators have also been critical of the right to control test. *See, e. g.,* Lesnick, *Job Security and Secondary Boycotts: The Reach of NLRA §§ 8(b)(4) and 8(e),* 113 U.Pa. L.Rev. 1000, 1036–39 (1965); Note, 77 Yale L.J. 1401, 1416 (1968) ("The modern primary-secondary analysis requires the complete abandonment of the present 'right to control' rule.").

Recently a panel of Ninth Circuit judges approved the Board's right to control test in dictum. *See Associated General Contractors of California, Inc. v. NLRB,* 514 F.2d 433 (decided March 28, 1975), *vacating* 207 NLRB No. 58 (1973). Although professing that a subcontractor's right to control is merely an "important factor" in assessing "all the surrounding circumstances" of a labor dispute, the *Associated General Contractors* court in effect asserted that a single, sufficient criterion for finding that a subcontractor is a "neutral, unoffending employer" is the fact that it "did not have and never had the power to accede to the union's demands." *Id.,* 514 F.2d at 437. *See also, e. g., id.* at 438 ("A union's right to enforce a work preservation clause against an employer may extend only to work which is his to assign. When it is applied to work beyond the employer's power to give, a work preservation clause necessarily embodies a prohibited secondary objective."). This is, in actuality, the *per se* right to control test. *See* note 9 *infra.* It is curious that in making these statements the Ninth Circuit panel acknowledged neither a contrary precedent in the Ninth Circuit, *see Western Monolithics, supra,* nor the analysis and holdings (or the existence) of contrary cases in four other circuits. Moreover, in basing its holding on the rationale that in such situations the union is seeking to acquire rather than to preserve work, the court manifested a misunderstanding of the nature of work preservation agreements. *See, e. g.,* 172 U.S.App.D.C. pp. ————, 521 F.2d pp. 898–900 & notes 25, 34, & 37 *infra.*

4. *See Local 438, Plumbers & Pipe Fitters,* 201 NLRB 59, *enforced sub nom. George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973). Unlike its earlier right to control opinions, in its *Koch* opinion the Board does say it is applying the "all the surrounding circumstances" test required by *National Woodwork* and all the Circuit Courts that have considered the question. But a mere reading of the Board's opinion demonstrates that its application of the *National Woodwork* test is *pro forma* and that its own right to control test is determinative. *See also* note 9 *infra.*

5. JA at 253.

indicated that the internal piping for these units was to be cut, threaded, and installed at the Slant/Fin factory, and the Board accepted the trial examiner's finding that "Hudik was aware of the specifications prior to making its bid and at the time it executed the subcontract" with Austin.[6] It is not disputed that this cutting, threading, and installation was the type of work which, under Rule IX of its collective bargaining agreement with the union, Hudik-Ross was obligated to have performed on the jobsite by its employees. However, there is no indication in the record, and the Board made no finding, that Hudik-Ross ever attempted to extricate itself from the pinch of two inconsistent contractual commitments by initiating bargaining with the union concerning a possible relaxation of Rule IX.

Shortly after the Slant/Fin units arrived at the Norwegian Home jobsite, a business agent for the union informed Hudik-Ross that the steamfitters represented by the union would not install the units because their internal piping had been completed at the factory in violation of Rule IX. The refusal to install the Slant/Fin units having delayed completion of the Norwegian Home, Austin filed a complaint with the Board charging that the union was violating Section 8(b)(4)(B) by encouraging individuals employed by Hudik-Ross to refuse to perform certain services with an object of forcing or requiring Austin and Hudik-Ross to cease using the products of Slant/Fin. Both the administrative law judge (ALJ) and the Board sustained Austin's charge, despite the fact that there was no evidence indicating that the union or its affiliates had ever attempted to organize Slant/Fin or that the union was even aware of the organizational status or working conditions of the Slant/Fin employees.[7] Indeed, the Board concluded that the union's refusal to let Hudik-Ross employees install the units "was for the purpose of preserving work they had traditionally performed."[8] However, applying its right to control doctrine,[9] the Board found

6. *Id.* at 234.

7. *See id.* at 236.

8. *Id.* at 254.

9. Since the right to control doctrine had been rejected by five circuits, the Board understandably did not mention that doctrine by name. Rather, after noting the union's work preservation purpose, the Board merely cited its *Koch* opinion and stated that "Hudik was incapable of assigning its employees this work; such work was never Hudik's to assign in the first place." *Id. See also* note 36 *infra.* In its brief to this court the Board admits that it is applying the right to control doctrine, but characterizes the test as merely creating a *"prima facie"* inference that there is an illegal secondary objective, "absent proof to the contrary." Brief for the NLRB at 5. We realize that under *SEC v. Chenery Corp.,* 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we review the Board's opinions and not its counsel's brief. However, since counsel's rationalization might be adopted by the Board in its next right to control case, we deem it useful, in the interest of bringing right to control litigation to an early conclusion, to comment on it. In short, we find that, given the virtual impossibility of proving the *lack* of the imputed secondary objective, this *"prima facie"* approach in effect constitutes the same old *per*

*se* test which we have condemned in our prior opinions and which contravenes the rationale and spirit of *National Woodwork. See,* 172 U.S.App.D.C. pp. —— – ——, 521 F.2d pp. 892–901, *infra.*

Our conclusion that Hudik-Ross is far from being an innocent neutral bystander to the dispute over installation of the prefabricated units does not depend at all on any suspicion that Hudik-Ross instigated Austin's decision to use the Slant/Fin units. *Cf. Painters Dist. Council No. 20,* 185 NLRB 930, 932 (1970). We fully accept the Board's factual finding that Hudik-Ross merely bid on a job for which Austin had already specified the Slant/Fin units. Rather, our conclusions are based on an analysis of *all the surrounding circumstances* of the conflict, *not just the circumstances relating to the locus of actual power to assign the work.* By contrast, once the Board finds that the employer lacked legal control, it finds a *per se* violation of § 8(b)(4)(B). *See generally Local 438, Plumbers & Pipe Fitters, supra* note 4. As we stated in *Local 742, Carpenters v. NLRB,* 144 U.S.App.D.C. 20, 24, 444 F.2d 895, 899 (1971):

The artificiality of the [Board's right to control] test is particularly patent in cases such as this one—where the employees apparently have a grievance growing out of labor relations with their own employer (*i.*

that the union's actions constituted impermissible secondary pressure against Hudik-Ross because Hudik-Ross, not having the legal power to determine who would perform the internal piping for heating and cooling units in the Norwegian Home, was a neutral in that dispute.

*id.* 172 U.S.App.D.C. at ——, 521 F.2d at 938 & n.101. *But see id.* at n.44.

Next, we are told that the Board has applied a *prima facie* test because it will validate a work preservation action against a subcontractor who possessed the legal right to control the work assignment but contracted away that right:

> The Board does not employ a *per se* formulation, which might well violate the stricture of *National Woodwork* that the focus of a union's action must be determined from all the surrounding circumstances; instead, the Board relies on a *prima facie* standard. By this test, a union may not boycott an employer who lacks the right to control the assignment of disputed work, *provided* that the employer has not voluntarily relinquished that control. The redeeming feature of this criterion is that it permits and even mandates the conclusion that the union acted properly in launching an economic action whenever "the employer's loss of power to assign the work is the result of his own efforts to instigate the subcontracting to another of work subject to his work preservation agreement with the union" * * *. In such a case the employer would cease to be neutral, and would be termed "offending" by virtue of his voluntary action surrendering legal control of the disputed work.

Dissenting op., 172 U.S.App.D.C. at —— — ——, 521 F.2d at 931 (footnotes omitted; emphasis in original). *See also id.* 172 U.S.App.D.C. at ——, 521 F.2d at 937 ("the *prima facie* right-to-control test rests on the Board's considered judgment that a subcontractor's *inability to affect or avoid prefabrication specifications* in general contracts renders him an inappropriate and impermissible target of union economic activity") (emphasis added). This is the approach of the Board as elaborated in *Koch*, and which, as we have indicated above, is a *per se* test once the *actual locus of legal control* is isolated; the Board does not consider other circumstances to determine whether the employer without control over the work itself is nevertheless not a neutral in the labor dispute.

Finally, the dissent asserts that the Board, in conformity with the *National Woodwork* decision, actually evaluated "all the surrounding circumstances" to determine whether Hudik-Ross was a neutral; the Board, under this rationalization, did not simply label Hudik-Ross a neutral party once the Board concluded it did not have, and never had, the legal power to assign its employees the disputed work. *See, e. g.,* dissenting op., 172 U.S.App.D.C. at —— — ——, —— — ——, ——, 519 F.2d

Note 9—Continued

e., loss of traditional unit work) and immediately provoked by an action of their own employer (*i. e.,* his signing of a contract which would deprive them of that work). The Board does not stop to consider these aspects of the dispute. Nor does it look to see whether there may be other grievances, against other employers, which underlie the union's action. Rather, the Board seems to hold that, when an employer contracts away his power to satisfy union demands, he also contracts away his interest and involvement in the labor relations issue in dispute. He is depicted as the mere passive agent of others * * *; the fact that the present dispute has its origin and its substantive focus in his ongoing labor relations with his employees is deemed irrelevant. * * *

(Footnote omitted.)

In attempting to rationalize and affirm the Board's holding, the dissenters present a smorgasbord of possible explanations of what the Board has done. *But see* dissenting op. at n.72. First, we are offered the *per se* right to control test in its purest form:

> Hudik is essentially neutral in this dispute *because it does not have and never did have the power to comply with the Steamfitters' demands.* Thus the pressure created by the Hudik employees' boycott of the Slant/Fin units *must have been directed at Austin and Slant/Fin as they were the only parties with the power to satisfy* the demand that the work be taken from Slant/Fin employees and reassigned to the Union.

*Id.* at 172 U.S.App.D.C. ——, 521 F.2d at 920 (emphasis added). *See also id.* at ——, 521 F.2d at 921 ("The Union is seeking what it asserts is *work preservation,* but the means it has chosen toward that end—a strike against an employer who never had the disputed work to assign—constitutes secondary pressure.") (emphasis in original); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 926 ("Even where right to control is not decisive, in almost any case it will be a factor entitled to very substantial weight because it measures the ability of the employer to comply with the union demands."); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 928 ("boycotts by craft unions against subcontractors *necessarily* have as a primary object the *application of pressure to those third parties who actually require the use* of factory-prepared products") (emphasis added); *id.* at n.53 ("[O]nly Austin and Slant/Fin are capable of acceding to the Union's demands. Thus Hudik is neutral with respect to the particular remedy of economic action which the Union invoked to redress its grievances.");

## II

Our two earlier opinions rejecting the Board's right to control test were guided by the teaching of the Supreme Court in *National Woodwork, supra.* Affirming the Board, the *National Woodwork* Court held that a work preservation clause in a collective bargaining agreement does not violate Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1970),[10] and that a carpentry union's refusal to install prefabricated doors pursuant to such a clause is primary activity that does not violate Sec-

Note 9—Continued

at 917–918, 925–926, 928–929, 941, & nn.8, 74. The dissent premises this explanation on the fact that the ALJ, in another context, used the phrase "all the surrounding circumstances," and the fact that the Board affirmed his "rulings, findings, and conclusions" to the extent they were consistent with its decision. *See, e. g., id.* 172 U.S.App.D.C. at ———, 521 F.2d at 925–926 & n.8. Based on this slender reed, we are implored to discount the fact that the Board, in citing *Koch* as the basis for its decision, was following its right to control test as fully enunciated in that case. The dissent wisely omits the Board's citation of *Koch* and similar cases in its otherwise extensive quotation from the Board's decision, *see id.* at n.10, and it is clear that both the ALJ and the Board simply categorized Hudik-Ross as a neutral *because* it lacked control over the assignment of the disputed work. Indeed, the ALJ concluded:

> While it is true that there are conflicting interpretations of the *National Woodwork* decision, *supra,* I believe that under the Board's view of the law the Respondent herein has violated section 8(b)(4)(i)(ii)(B) of the Act *since Hudik was a secondary employer that,* unlike Frouge in the *National Woodwork* case, *had no control over the selection and specification of the prepiped units.* * * *

JA at 242 (emphasis added). Moreover, the cases cited and discussed by the ALJ, *see* JA at 237, 242 n.13, are all ones in which the Board determined that the locus of control over the work in dispute was conclusive as to the question of the legality of the union's activity.

Nevertheless, it is true that the ALJ employed the phrase "surrounding circumstances" in the hypotheticals quoted by the dissent, *see* dissenting op. at n.8, and the dissenters dwell at considerable length on the circumstance to which the ALJ referred—the extent to which the construction industry in major metropolitan areas is unionized. *See, e. g., id.* 172 U.S.App.D.C. at ———, 521 F.2d at 928–930. However, the ALJ simply referred to that factor as a circumstance which he believed made Hudik-Ross an *effective* instrumentality of pressure against Austin and Slant/Fin. *See id.* at n.8. Even the ALJ recognized that this factor (effectiveness or ineffectiveness of secondary pressure) is absolutely irrelevant to the question of whether Hudik-

Ross was a *neutral* in the labor dispute and thus immune even from *threats* of secondary pressures under § 8(b)(4)(B). *See id.* ("the fact that in Example A * * * Hudik would be an ineffective means of pressure by the Union against Slant/Fin and Austin, and, in Example B, the instant case, Hudik is an effective means of pressure in view of all the surrounding circumstances, does not alter the fact that in both situations, Hudik is a means or instrumentality and that the Union's primary dispute is with Slant/Fin and Austin"). *But see* dissenting op. at n.55. Thus the ALJ's use of that phrase (as part of an argument that Hudik could not comply with the union's demands) in no way discredits our conviction that both the ALJ and the Board are continuing to apply an impermissible *per se* right to control test. Moreover, as we elucidate more fully later in our opinion, both the ALJ and the Board are incorrect in the premises which underlie both the right to control test and the hypotheticals the dissent quotes; Hudik is not a neutral in this labor dispute, *see generally* pp. 172 U.S.App.D.C. ———, 521 F.2d pp. 921–928, *infra,* and it may comply with the union's demands, even without ceasing doing business with Austin and Slant/Fin or attempting to force them to change their business practices, *see, e. g.,* pp. 172 U.S.App.D.C. ———, 521 F.2d pp. 924–928, *infra.*

10. Except for those agreements specified in the proviso to § 8(e), that section renders void and unenforceable an employer's agreement to do that which § 8(b)(4)(B) prevents the union from exerting pressure to bring about. *See* note 38 *infra.*

The language of § 8(e) is comparable to the language of § 8(b)(4)(B) in most significant respects:

> (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [*sic*] and void[.] * * *

tion 8(b)(4)(B) when the union's sole objective is preservation of work which its member employees had traditionally performed. The Court traced the evolution of Sections 8(b)(4)(B) and 8(e) and determined that the sweeping language of these sections had to be qualified by the congressional intent, now expressed in the proviso to Section 8(b)(4)(B), to permit coercive union activity which had traditionally been considered primary rather than secondary.[11] Recognizing that the critical distinction between secondary and primary activity would often be a subtle and difficult one to make, the Court concluded that the determination whether the carpentry union's refusal to install the premachined doors was protected primary activity would turn on an "inquiry into whether, under *all the surrounding circumstances*, the Union's objective was preservation of work for [the struck employer's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere. * * * The *touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting [struck] employer vis-a-vis his own employees."*[12] The Supreme Court found that the Board had appropriately applied this test for distinguishing primary from secondary activity since the Board had ascertained on the basis of substantial evidence that the carpentry union's refusal to install the prefabricated doors "related solely to the preservation of the traditional tasks of the jobsite carpenters."[13]

As we recognized in *Local 742, supra,* and *Local 636, supra,* the *National Woodwork* Court explicitly noted that it was not presented with the question of the propriety of the Board's right to control doctrine since the struck employer in that case was a general contractor who had the legal power to determine who performed the work the union desired to preserve.[14] We nevertheless held, as have all but one of our sister circuits that have faced the issue,[15] that the rea-

11. In 1959, a proviso was added to § 8(b)(4)(B), explicitly exempting primary activity from the prohibitions of that section:

*Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

The *National Woodwork* Court held that, in light of congressional intent, the same limitation was implicitly incorporated into § 8(e). *See* note 38 *infra.*

12. 386 U.S. at 644–45, 87 S.Ct. at 1268 (emphasis added; footnotes omitted). In a companion case, *Houston Insulation Contractors Assn. v. NLRB,* 386 U.S. 664, 668, 87 S.Ct. 1278, 1281, 18 L.Ed.2d 389 (1967), this language was reaffirmed. *"National Woodwork Mfrs., supra,* holds that collective activity by employees of the primary employer, the object of which is to affect the labor policies of that primary employer, and not engaged in for its effect elsewhere, is protected primary activity."

13. 386 U.S. at 646, 87 S.Ct. at 1268.

14. *See id.* 386 U.S. at 616–17 n.3, 87 S.Ct. 1250. Much of the argumentation in the briefs to the Court in *National Woodwork* concerned the propriety of upholding the union's actions *because* the employer had control of the work. Indeed, the Board felt compelled to assert that even if the Court might conclude that the Board and the court below placed undue emphasis on the fact that Frouge had "control" over the kind of doors he could use * * * the result reached * * * is nevertheless proper.

Brief for the NLRB at 7. Rather than base its holding on the extent of employer control, the Supreme Court engaged in a detailed factual examination of "all the surrounding circumstances" of the dispute. Seen from this perspective, its "reservation" of the control question is better understood as a warning that the opinion not be read as impliedly *approving* the Board's right to control doctrine. In resolving the right to control problem, we now follow the lead of the Supreme Court in determining, on all the factors presented, whether the union's goal is solely work preservation and whether the struck employer is a neutral to the dispute.

15. *See* note 3 *supra.* Even the Fourth Circuit, in approving the Board's right to control test, was at pains to conclude that in finding a violation the Board had looked to "all the surrounding circumstances," as required by *National Woodwork. See Koch, supra* note 4, 490 F.2d at 327. However, the Board in that case found the subcontractor's lack of control determinative of the legality of the union's conduct, *see* 201 NLRB at 61; all of the "surrounding circumstances" supplied by the

soning underlying the *National Woodwork* decision compels the conclusion that an employer's lack of legal control over the work the union seeks to preserve for its members cannot alone be decisive of the legality of the union's objectives.[16] Indeed, we remain convinced that, absent other evidence that a work preservation strike is actually intended to satisfy illegal secondary objectives, such a strike is lawful primary activity, protected under Sections 7 and 13 of the National Labor Relations Act, 29 U.S.C. §§ 157, 163 (1970),[17] as well as under the proviso to Section 8(b)(4)(B).

#### A.

In validating work preservation clauses, the *National Woodwork* Court placed primary reliance on the legislative history of Sections 8(b)(4)(B) and 8(e). The Court determined that Congress only intended these sections to prohibit coercive union activity that is directly exerted against an "unconcerned"[18] or "neutral"[19] employer, drawn by the union's activities into "disputes not his own."[20] Section 8(b)(4)(B) was seen as an accommodation between the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."[21] The Board acknowledges that the neutrality of the employer against whom pressure is directly exerted is critical to the distinction between primary and secondary activity.[22] It nevertheless comes to the remarkable conclusion that an employer like Hudik-Ross, which is struck by its own employees for the purpose of enforcement of a clause in its collective bargaining agreement with these employees which preserves work which the employees have traditionally performed, is the type of innocent neutral which the Supreme Court says Section 8(b)(4)(B) was fashioned to protect. We cannot agree with the Board's portrayal.

To assert that Hudik-Ross is a neutral bystander innocently caught up

---

Fourth Circuit in its opinion were merely alternative ways of describing that fact. *See* 490 F.2d at 327.

**16.** While the employer's lack of legal control cannot be determinative, it may still be considered by the Board as part of its inquiry into the union's actual objectives. *See Local 742, Carpenters v. NLRB, supra* note 9, 144 U.S. App.D.C. at 28, 444 F.2d at 903; *Local 636, Plumbers & Pipefitters v. NLRB,* 139 U.S.App. D.C. 165, 169–70, 430 F.2d 906, 910–11 (1970). *See also* 172, U.S.App.D.C. pp. ——–——, 521 F.2d pp. 903–905, *infra.*

**17.** These sections preserve the right of employees to strike and to engage in other concerted activities for the purpose of mutual aid or protection. The *National Woodwork* Court stated that, in "the absence of clear indicia of congressional intent to the contrary, these provisions caution against reading statutory prohibitions as embracing employee activities to pressure their own employers into improving the employees' wages, hours, and working conditions." 386 U.S. at 643, 87 S.Ct. at 1268.

**18.** *Id.,* 386 U.S. at 624, 87 S.Ct. 1250.

**19.** *Id.* at 623, 632, 87 S.Ct. 1250.

**20.** *Id.* at 620, 626, 87 S.Ct. 1250.

**21.** *Id.* at 626–27, 87 S.Ct. at 1259 *quoting NLRB v. Denver Bldg. & Constr. Trades Coun-*

*cil,* 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The dissenting judges delve into the legislative history of §§ 8(b)(4)(B) and 8(e) to prove that Congress was particularly concerned with *installation* abuses and thereby to prove that the refusal to install the prepiped units was illegal secondary activity. *See, e. g.,* dissenting op., at 172 U.S.App.D.C. at ——–——, 521 F.2d at 922–925. However, the *National Woodwork* Court has already thoroughly canvassed this legislative history, *see generally* 386 U.S. at 620–44, 87 S.Ct. 1250, and has concluded that the refusal to install prefabricated products is proper if the pressure is exerted against an employer who is not a neutral in the dispute. Merely characterizing the controversy as one involving purported installation abuses (and generally in the context of union action initiated with the objective of expanding the union's representational jurisdiction, *see e. g.,* dissenting op., 172 U.S.App.D.C. at ——–——, 521 F.2d at 923–924) does not lead to the delphic conclusion that the pressure in this case is tainted secondary activity.

**22.** *Local 438, Plumbers & Pipe Fitters,* 201 NLRB 59, 61 (1973); brief for the NLRB at 5. *See also, e. g.,* dissenting op., 172 U.S.App. D.C. at ——, 521 F.2d at 922.

in the union's attempts to achieve its objectives by changing Austin's policy of purchasing prefabricated climate control units is to ignore the realities of this labor conflict and the process by which Hudik-Ross was confronted with conflicting contractual commitments. The Hudik-Ross management did not innocently awake one day to find itself in the midst of this dispute. The management had negotiated, presumably in good faith, a collective bargaining agreement which obligated Hudik-Ross to preserve for its employees the work of cutting and threading internal piping on the climate control units which these employees were to install. When the management subsequently executed a contract with Austin which it was fully aware would require its employees to install units on which these employees had not done the internal piping, it could hardly have expected the employees to acquiesce in the blatant violation of their contractual rights.[23] As we emphasized in *Local 742, supra,* "The legal effect of the Board's test is to allow an employer to bind his own hands and thereby immunize himself from union pressure occasioned by his employees' loss of work. In one act, the employer helps to create a labor conflict and simultaneously wash his hands of it."[24] Hudik-Ross could have totally avoided the labor dispute merely by honoring its bargaining agreement and not bidding on a contract which required it to breach the valid work preservation provision it had negotiated with the union.[25] Thus, to accept

**23.** Indeed, the terms of the collective bargaining agreement itself provide internal indicia that Hudik-Ross is not a neutral to this dispute. Article One of that agreement specifies that both parties are to abide by certain rules governing wages, hours, "and other conditions of employment." JA at 210. Rule IX is among those to which both sides agreed to be bound. JA at 213. Article Two of the agreement then stipulates that strikes or lockouts are to be prohibited, but only "so long as this agreement *and the rules hereto attached* are conformed to by both parties." JA at 210 (emphasis added). Hudik-Ross must therefore have realized that it had contractually acknowledged the union's right to strike in the situation presented to us. Indeed, it is curious that Hudik-Ross, the "neutral" that was supposedly injured by being dragged into a "labor dispute not its own," did not file the charge of an unfair labor practice; rather, it was filed by the general contractor, Austin. Perhaps Hudik-Ross perceived the injustice that would result if it attempted to have the Board directly rectify Hudik-Ross' breach of contract; perhaps it merely sought to avoid the exacerbation of labor relations that would result by adding this insult to the injury it had previously inflicted on the union. We appreciate the fact that a contractual provision cannot immunize either an employer or a union from an unfair labor practice charge. *See, e. g., Radio Officers' Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). However, we see no justification for converting this dispute over enforcement of a valid contractual provision, in which the union lawfully strikes in accordance with an explicit bargaining clause, into an unfair labor practice proceeding before the Board.

**24.** *Local 742, Carpenters v. NLRB, supra* note 9, 144 U.S.App.D.C. at 24, 444 F.2d at 899.

**25.** We do not believe that this restriction unduly ties an employer's hands concerning managerial decisions. Hudik-Ross could have, and still can, negotiate collective bargaining agreements which exempt from the work preservation clause work over which it does not have legal control. Indeed, on remand the Board is free to reconsider whether the parties to the agreement actually intended the cutting, threading, and installation of the internal piping of the climate control units to fall within its scope in the situation here presented. The dissent implies that the ALJ has already made a finding that the parties to the bargaining agreement did not so intend, and that the Board implicitly upheld this finding. *See, e. g.,* dissenting op., 172 U.S.App.D.C. at ———-———, ———, 521 F.2d at 927–928, 940, & nn.71 & 106. However, the dissent recognizes that the ALJ declined to rely on his "opinion" that Rule IX "necessarily implied that it referred to pipe within Hudik's control," *see* JA at 237. Dissenting op. at n.7. In any event, the ALJ's "opinion" appears to be premised on his views of the ultimate merits of the right to control doctrine rather than on any expertise in interpreting collective bargaining agreements, and would appear to be contradicted by the plain language of the agreement, which stipulates that "[r]adiator branches, convector branches and coil connectors *shall be cut and threaded by hand on the job * * *.*" JA at 233 (emphasis added). The Board accepted the fact that the work stoppage was motivated by the desire to preserve traditional unit work, and we therefore do not believe it accepted any finding (to the extent one may have been

the Board's characterization of Hudik-Ross as a neutral bystander under these

circumstances would allow the "Cinderella-like transformation of an obviously in-

Note 25—Continued

made) that this work was not intended to be included within the ambit of Rule IX. *See also* text appended to dissenting op. Figure 1. In any event, custom and tradition in the industry must also be looked to in determining the intent of the parties with respect to what work is to be preserved, even in the absence of an explicit work preservation provision. *See Local 742, Carpenters v. NLRB, supra* note 9, 144 U.S.App.D.C. at 24, 444 F.2d at 899. Moreover, given the record now before us, when the Board on remand analyzes "not only the situation the pressured employer finds himself in but also how he came to be in that situation," in order to determine whether he is an "unoffending party," *see Local 438, Plumbers & Pipe Fitters, supra* note 4, 201 NLRB at 64, it must consider whether Hudik-Ross knowingly entered the second contract in contravention of the prior one.

It is important to recognize that Hudik-Ross' refusal to bid on the Austin contract, in compliance with its collective bargaining agreement, would indeed serve work preservation goals. This point is often misunderstood. For example, the ALJ in this case asked rhetorically: "[I]f Hudik, an employer of union steamfitters, does not bid on jobs and does not secure subcontracts, how does such a situation preserve or increase work for Hudik's union steamfitters[?]" JA at 240. Yet he had unknowingly answered that question himself earlier in his opinion: "If prepaid [*sic*] units cannot be installed \* \* \* Austin and other engineers and general contractors will not specify their purchase and use in buildings." JA at 239. The union certainly expected the work preservation clause to be complied with. Like the ALJ, it knew such clauses would in fact subserve its legitimate end of ensuring that its members could continue to perform in the future the work they had traditionally performed in the past. Of course, it is also true that Hudik-Ross and similar employers could bid on a subcontract specifying prefabricated products and still satisfy a union's work preservation goals, but in this latter situation they would probably be subserved by negotiation of a monetary settlement that would partially compensate the employees for their lost work. *See* 172 U.S.App.D.C. pp. ——–——, 521 F.2d pp. 898–900 & note 34 *infra*. It should also be noted that the dissent, apparently oblivious to the fact that Hudik-Ross could take this latter tack, compounds its error by making the statement, which has no support in the record, that "Hudik could not decline to bid on projects with prefabrication specifications and continue to be a competitive subcontractor." Dissenting op., 172 U.S.App.D.C. at ——, 521 F.2d at 928. If this were actually the case,

one might wonder why Hudik-Ross contractually bound itself to such an allegedly self-destructive course.

Although the Board rejected the ALJ's misconception that Rule IX was not designed for work preservation purposes in these circumstances, a similar fallacious belief may lie at the root of its right to control doctrine. In its brief to the Supreme Court in *National Woodwork,* in supporting its claim that the union had not violated § 8(b)(4)(B), the Board stated:

[T]his provision [in the bargaining agreement in *National Woodwork*] was a lawful work preservation clause, reflecting the Union's policy of preserving for jobsite carpenters work which they have performed for over 80 years. *Since Frouge had failed to abide by this lawful contract provision, the Union had a legitimate dispute with him*; and, since he was not required by any arrangement with the project owner to use pre-cut doors, Frouge was in a position to accede to the Union's demands without having contract relations severed or even directly affected. Accordingly, by refusing to handle pre-cut doors for Frouge, the Union confined its activity to the employer with whom it had its basic dispute, and its activity was therefore primary.

Brief for the NLRB at 5–6 (emphasis added). If the Board is serious about its characterization of the union/Hudik-Ross provision as a valid work preservation clause, the logic of *National Woodwork* should mandate a conclusion that the union's activity in our case is lawful. In *both National Woodwork* and this case, there was a valid work preservation clause. In *both National Woodwork* and this case, the employer could comply with the union's demands *before* breaking the contract. And, contrary to the Board's assertion, in *both National Woodwork* and this case, *some* third party would inevitably be affected by compliance *after* the contract was broken. Admittedly, only a manufacturer was involved in *National Woodwork,* whereas this case involves both a manufacturer and a general contractor. But that cannot obscure the fact that for all relevant analytical purposes the situation of the two employers is identical. *See also* note 28 *infra.*

A final misconception concerning work preservation agreements between subcontractors and unions is that exhibited by the dissent, *see, e. g.,* dissenting op., 172 U.S.App.D.C. at ——–——, ——, 521 F.2d at 921–922, 928, and by the recent panel opinion in the Ninth Circuit, *see Associated General Contractors of California, Inc. v. NLRB, supra* note 3, 514 F.2d at 435. This misconception involves the belief that when a subcontractor's employees request that when a construction contract

volved party," [26] and would both render nugatory the commitment which Hudik-Ross made [27] and demean the collective bargaining process which is the cornerstone of labor relations in the United States.[28]

The Board insists on closing its eyes to the circumstances surrounding the creation of this labor dispute, circumstances which belie the assertion that Hudik-Ross is a neutral caught between the contending forces really involved in the work preservation controversy.[29] In-

Note 25—Continued

specifies prefabricated products the subcontractor either not bid on the contract or else compensate them for their lost work, they are not seeking to *preserve* traditional work but are attempting to *acquire* additional work. However, by the very nature of subcontract bidding, a subcontractor will always be acquiring work when he bids on a project; the characterization of union activity as having a work preservation objective must therefore depend on whether it is the *type* of unit work which the employees have traditionally performed, not whether they actually performed the particular work in question. And as indicated above, enforcement of a work preservation clause is designed to protect such traditional work whether the subcontract specifications themselves required that the traditional work be replaced by prefabrication or whether the specifications granted to the subcontractor discretion to displace the employees' traditional work. In both situations the union seeks to prevent elimination of employees' work through factory prefabrication or, at a minimum, to prevent their employer from lending active support to elimination of that work.

**26.** *Local 742, Carpenters v. NLRB, supra* note 9, 144 U.S.App.D.C. at 24, 444 F.2d at 899.

**27.** As Judge Lasker observed in a similar situation:

It would be unthinkable to apply the "right to control" test to facts such as those just outlined. To do so would be to encourage subcontractor employers to undermine their collective bargaining agreements by actively soliciting contracts whose very terms called for conduct violative of those trade agreements * * *. Manufacturers and general contractors, too, would be tempted to insert all manner of specification and standard[s] into their licenses and contracts with a total disregard of subcontractors' commitments to their respective unions.

*Danielson v. Painters Dist. Council No. 20, supra* note 3, 305 F.Supp. at 1115.

**28.** *Cf., e. g., International Union of Electrical Workers v. NLRB,* 138 U.S.App.D.C. 249, 255, 426 F.2d 1243, 1249, *cert. denied,* 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970).

In its brief for respondent NLRB at 26, which it filed in *National Woodwork,* the Board stated:

[W]here, as here, the union is opposed to a product, not because of its price or its de-

sign, but because it deprives the employees whom the union represents of work which they have traditionally performed, there is a sufficiently direct connection between the product and employment security to bring the question respecting the use of that product within the area of mandatory bargaining under the Act.

However, in its *Koch* opinion the Board distinguished *National Woodwork* and *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), from a situation where the employer lacks power to assign the work sought to be preserved:

The situation here is radically different since Phillips never initially had the disputed work and thus obviously could not have contracted away that which it never had and could not have been ordered to bargain over that which it never had.

201 NLRB at 63 n.22. We fail to comprehend the logic of this assertion. Certainly Phillips in that case and Hudik-Ross in our case were free to agree not to execute other contracts which would require them to force their employees to handle prefabricated goods. This is effectively what a work preservation clause requires in the present situation. Although we do not reach the substantial question whether employers could be forced to bargain over such clauses, we find that, having negotiated and agreed to such a clause, Hudik-Ross must abide by it; nothing in the Act or the Supreme Court's decision in *National Woodwork* requires that an employer be allowed to escape such a freely-undertaken obligation merely by unilaterally executing subsequent contracts.

**29.** The Board's holding has the potential for unnecessarily harsh or excessively disruptive results. Although the ALJ found that Austin and Slant/Fin were the primary employers for purposes of the work preservation dispute with the union, the Board declined to decide whether the union could therefore have exerted direct pressure against them. *See* JA at 254 n.1. It is thus possible that the Board is prepared to accept the position advanced by *amicus curiae* Chamber of Commerce of the United States that, unless the target of the strike has *both* the power to control the work assigned and a bargaining relationship with the union, the union's economic pressures are illegal secondary activity. In the present case there would thus be no primary employer; indeed, in most subcontracting situations the subcontractor's employees would be deprived

stead, it reasons that, since "[the subcontractor] had no past, present, or future authority to award this work to the Respondents, their actions here must have been undertaken to produce their effect elsewhere," [30] and thus must violate Section 8(b)(4)(B).[31] From the premise that it is "reasonable to hold that the object of the union was not an impossible act but was the alternative possible," [32] the Board reaches what it considers to be an ineluctable conclusion that "where the pressured employer cannot himself accede to the union's wishes, the pressure is secondary because it is undertaken for its effect elsewhere." [33] But rhetoric and rationalization are no substitute for substantial evidence. Even ignoring Hudik-Ross' actions in initially bidding on the subcontract, the fallacy of the

---

of all economic weapons and all legal mechanisms for preserving their traditional work against onrushing technological changes. We do not find it necessary to rule on whether the union could have exerted pressure directly against Austin or Slant/Fin. However, we do note that interpreting § 8(b)(4)(B) so that, in a situation where a union is motivated by a single lawful goal, it is nevertheless adjudged guilty of secondary activity without there being some employer against whom it could have exerted pressure gives the section a harshness which has not heretofore been suggested by its most aggressive proponents. Certainly nothing in § 8(b) compels such a result.

On the other hand, when a union's sole objective is work preservation, it would be anomalous to allow it to press its demands on a general contractor with whom it has no ongoing relationship. Rather than limit the scope of labor disputes consonant with the congressional intent expressed in § 8(b)(4), such a result is likely to expand them since it would probably affect all subcontractors on a jobsite. The *National Woodwork* Court tacitly accepted work preservation as a legitimate subject of mandatory collective bargaining, within the "wages, hours, and other terms and conditions of employment" language of §§ 8(d) and 9(a) of the National Labor Relations Act. *See* 386 U.S. at 642–43, 87 S.Ct. at 1267; note 28 *supra*. Disputes over such subjects are best resolved within the bargaining unit encompassing the contending parties. *See also Connell Constr. Co. v. Plumbers & Steamfitters Local No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

Although our holding that the right to control test must be rejected is not based on the above considerations, we find that they shed light on Hudik-Ross' actual involvement with the subject matter of this labor dispute.

**30.** *See Local 438, Plumbers & Pipe Fitters, supra* note 4, 201 NLRB at 62.

**31.** *See National Woodwork*, 386 U.S. at 645, 87 S.Ct. 1250.

**32.** *Local 438, Plumbers & Pipe Fitters, supra* note 4, 201 NLRB at 62 n.14, *quoting Ohio Valley Carpenters Dist. Council v. NLRB*, 339 F.2d 142, 145 (6th Cir. 1964).

**33.** 201 NLRB at 63. *See also George Koch Sons, Inc. v. NLRB, supra* note 4, 490 F.2d at 327. Indeed the whole affirmative case that the Board makes for the right to control doctrine is found in a single simplistic paragraph of its *Koch* opinion:

By the contract under which [the subcontractor] Phillips was to perform its work at the G.E. site or not perform any work at all, *Phillips was contractually required to utilize in its work certain prefabricated pipe* which had not been worked on by the employees the [union] Respondents represented. Thus, *although the Respondent's claim of work preservation was indeed valid,* Phillips by its contract with [the general contractor] *Koch had no power to give the Respondents the work they sought,* since such work was never Phillips' to award in the first place. And as Phillips had no past, present, or future authority to award this work to the *Respondents,* their *actions here must have been undertaken in order to produce their effects elsewhere. Therefore,* since the pressure directed at Phillips was undertaken for its effect elsewhere, *such activity was secondary* even though Phillips was the immediate employer here. As the Supreme Court itself said in *National Woodwork,* "In effect Congress in enacting § 8(b)(4)(A) of the Act (hence this holds for the present Section 8(b)(4)(B)) . . . barred as a secondary boycott union activity *directed against a neutral employer,* including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere."

201 NLRB at 62 (emphasis added; footnotes omitted).

As our opinion elaborates, we remain bewildered as to how Hudik-Ross may be characterized as "neutral" when it executed its contract with Austin in violation of a concededly valid work preservation clause. Nor can we understand how the union's refusal to acquiesce in that violation must indicate that its objectives were "directed elsewhere," particularly since Hudik-Ross could itself satisfy the union's demands, whether by negotiating a compromise with the union or, as in *National Woodwork,* terminating its tainted contract with Austin.

Board's conclusion is readily apparent. For even if one focuses narrowly on the point in time when Hudik-Ross had already executed its second contract, one can clearly see that it was possible for Hudik-Ross to settle the labor dispute which it had created. The record is void of any suggestion that Hudik-Ross attempted to negotiate a compromise with the union under which the union would have agreed to install the climate control units in exchange for extra pay or other special benefits.[34] If the Board's finding that the union's purpose in refusing to install the units was work preservation was correct, it can be assumed that the union would have accepted a payment from Hudik-Ross to the employees to compensate them at least in part for the employer's breach of the bargaining agreement. Unions presumably seek agreements to preserve for their members the work which they have traditionally performed in order to maintain the income level of the members. Evidence that the union was unwilling to permit its members to install the prefabricated units even if they were paid for the work they lost by the prefabrication would call into question the Board's finding that the union's objective was merely work preservation; it would suggest

34. Hudik-Ross was free to engage the union in negotiations either before or after it had accepted the subcontracting work. Such negotiations could have centered on an appropriate compromise payment that employees would receive for installing the prefabricated units, although other bargaining solutions were possible. For example, when the collective bargaining agreement was originally accepted the union may have given up demands for additional vacation time or other fringe benefits in order to receive the work preservation guarantee; Hudik-Ross could have achieved a settlement with the union by making concessions on such matters as a *quid pro quo* for the union's relaxation of the strictures of Rule IX. Alternatively, Hudik-Ross could have sought an arbitrated solution of the controversy. We cannot understand how, in the absence of such initiatives, Hudik-Ross may be labeled an innocent bystander. The Board appears to place the burden of finding such peaceful resolutions on the union, but we believe that Hudik-Ross, which was the culpable party in generating the controversy, had an obligation to reconcile its actions with its contractual commitments. If Hudik-Ross desires protection from work preservation pressures in the future, it need only negotiate an agreement that incorporates a no-strike provision and that stipulates that such disputes will be submitted to arbitration. *Cf. Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). However, no such provision precluded the work stoppage in this case, *see* note 23 *supra,* and it is improper for the Board to limit the union's arsenal of weapons as a matter of law. *Cf. NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 497–98, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). And although the dissent might believe it is "preferable" to resort to such peaceful mechanisms for resolving work preservation controversies, *see* dissenting op. at n.66, there is no justification in the Act for asserting that arbitration must be employed or that only a suit for contract breach is proper in the circumstances of the case *sub judice, see* note 38 *infra* ; if the employer seeks to exclude certain instruments from the union's armamentarium, the collective bargaining process accords him an adequate and appropriate mechanism for doing so.

What would appear to be a paradigmatic voluntary vehicle for peacefully settling work preservation disputes, both allowing the subcontractor to bid for construction contracts involving prefabricated products and guaranteeing union compensation for an employer's breach of his collective bargaining agreement, was executed by several of the parties involved in *Associated General Contractors of California, Inc. v. NLRB, supra* note 3. There a trade council composed of 17 local unions and a trade association of employers in the construction industry had negotiated a work preservation agreement; if a union representative believed that the agreement was being violated, the union could require the employer to cease doing the contested work, but only for a period of 72 hours, while a joint arbitration board investigated the merits of the claim. After the expiration of 72 hours, the employer could resume work whether or not the investigation was complete. The arbitration board could make a variety of appropriate awards against an offending employer, including "pay[ment of] the equivalent in wages and fringe benefits lost by employees * * *" into the union's pension fund. Nevertheless, the court in that case found the arbitration board's assessment against the offending employer of approximately $560 to be improper since it determined that, to the extent the agreement covered work not within a subcontractor's legal control, it was a prohibited "hot cargo" clause in violation of § 8(e), and that enforcement of that clause constituted a violation of § 8(b)(4)(B).

that the union desired to boycott Slant/Fin's goods for some other reason, such as that firm's labor relations policies. However, such evidence was not adduced and, given the Board's finding that the union's purpose was work preservation, we cannot speculate as to its existence.[35]

Of course, Hudik-Ross might prefer to terminate its subcontract with Austin or pressure Austin to change its specifications for premachined climate control units rather than to negotiate with its employees as to alternatives for compensating them for their lost work. However, the fact that such a decision might have adverse effects on other employers like Austin and Slant/Fin does not transform an involved employer like Hudik-Ross against whom pressure is exerted into an innocent neutral.[36] For as the *National Woodwork* Court teaches, in enacting the proviso to Section 8(b)(4)(B) Congress made it clear that even a strike which would inevitably have an adverse impact on a secondary employer, like the National Woodwork Association member in that case who had contracted to sell prefabricated

35. There was no evidence that the union would have installed the Slant/Fin units if the employees who worked on the internal piping off the jobsite had been organized in an affiliated labor organization. Nor was there any evidence that the union's actions were motivated by, or that the union was familiar with, the organizational status of the Slant/Fin employees. *Cf. National Woodwork*, 386 U.S. at 646, 87 S.Ct. at 1269.

36. Congress was concerned with the injury suffered by neutral employers, but only where the injury resulted from the use of a secondary boycott. Almost every strike causes economic loss to one or more employers who are unconcerned with the labor dispute. A coal distributor may go bankrupt because of a coal strike. A small steel fabricator may be forced to close his doors because of a major steel strike. Such economic losses as these far outweigh the losses caused by secondary boycotts. Yet Congress has not sought to aid these neutrals * * *. This point is significant—and sometimes overlooked—because it shows that, while harm to a neutral is an essential ingredient of a secondary boycott, such injury is not by itself objectionable in the eyes of the legislature.

Tower, *A Perspective on Secondary Boycotts*, 2 Lab.L.J. 727, 732 (1951), *quoted with approval in* Lesnick, *The Gravamen of the Secondary Boycott*, 62 Colum.L.Rev. 1363, 1411–12 (1962). *See also* Note, *supra* note 3, 77 Yale L.J. at 1416–17. The dissent, however, apparently fails to distinguish between the impermissible *objectives* of secondary activity and the permissible *effects* of primary activity. *See, e. g.*, dissenting op., 172 U.S.App.D.C. at ——, 521 F.2d at 930 (manufacturer may be "materially affected"); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 937 (referring to "secondary effects of impermissible magnitude"); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 940 ("prohibited secondary effects and objects"); *id.* at nn.78 & 87. *See also Local 636, supra*

note 16, 139 U.S.App.D.C. at 168–69, 430 F.2d at 909–10.

Our conclusion as to the legality of the union's activity might be different if the union actively sought termination of the Slant/Fin contract by exerting pressure directly against Austin. *Cf. National Woodwork*, 386 U.S. at 630–31, 87 S.Ct. 1250. In such circumstances, termination of that contract would not simply be an ancillary effect of the union's primary action, but an objective whose legality would have to be assessed independently. If Hudik-Ross is recognized as the primary employer for purposes of this work preservation dispute, the Board might reconsider whether Austin might appropriately be held to be a neutral party against whom economic pressure could not be directly applied. *See* note 44 *infra*. We note, however, that contrary to the assertions of the dissenting judges, *see, e. g.*, dissenting op., 172 U.S.App.D.C. at ——, ————, ——, 521 F.2d at 916, 918, 930, the mere fact that on a single occasion the union "informed Austin * * * that it would not let Hudik install the climate control units involved," JA at 254, does not constitute sufficient evidence to indicate that impermissible pressure was directed against Austin. Indeed, in simply informing the general contractor, contemporaneously with the arrival of the prepiped units on the jobsite and the initial notification of Hudik concerning the union's belief that the work was guaranteed to it by Rule IX, that the union would not install those units "because the piping inside the units was steamfitters' work," *id.* at 235, the union was doing no more than Hudik-Ross should have done in apprising Austin of the fact that Hudik-Ross' conflicting contractual commitments had generated a labor controversy at the jobsite. However, we nevertheless leave the question of whether there are additional indicia that the union's pressures were actually directed against Austin (and that Austin was a neutral in the dispute) open for the Board's consideration on remand.

doors, is not proscribed by Section 8(b)(4)(B) if the employer struck is not an innocent neutral to the union's dispute.[37]

The Board's right to control doctrine is a continuing attempt to circumvent the congressional proviso and is inconsistent with the Court's analysis in *National Woodwork*. Moreover, it is a continuing inducement for employers to violate their bargaining agreements. If employ-

ers do not want work preservation clauses to cover prefabricated units, they should not sign bargaining agreements with such clauses unless they so state. And when an employer gets himself into a bind, as did Hudik-Ross, he should arbitrate or negotiate his way out. Having the Board bail him out is to demean the National Labor Relations Act by encouraging deliberate, if not always planned, violations of bargaining agreements.[38]

**37.** 386 U.S. at 627, 87 S.Ct. at 1259. The Board contends that these possible effects cannot be deemed ancillary because "it is impossible to achieve [them] except by the forbidden means of forcing another independent contractor to change its policy or terminate a business relation." Brief for the NLRB at 26. However, as we stressed in our discussion of Hudik-Ross' neutrality, it was possible for Hudik-Ross to effectively satisfy the union's demands without affecting the contractual rights of any third party. Moreover, the mere fact that meeting a union's demands requires termination of contracts with third parties does not invariably indicate the presence of secondary activity. *See National Woodwork*, 172 U.S. App.D.C. pp. —— – ——, 521 F.2d 902–903, *infra*. The dissent, like the Board, apparently also fails to comprehend that work preservation clauses are essentially fashioned to preserve employees' wages, and that negotiated settlements, within a subcontractor's power to achieve, may be arrived at in order to compensate the employees for the subcontractor's breach of his collective bargaining agreement. *See, e. g.,* dissenting op., 172 U.S.App.D.C. at —— – ——, 521 F.2d at 916–917 (presuming disputed work would actually have to be redone rather than resolved through a monetary settlement); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 918 (only Austin could comply with union's demands); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 920 ("absurdity" to believe union pressure directed against Hudik, which could not meet demands); *id.* at ——, 521 F.2d at 924 (demands could only be met by dismantling manufactured articles at jobsite and redoing work); *id.* 172 U.S.App.D.C. at ——, 521 F.2d at 931 ("Hudik's alternatives were either to bid on the Norwegian Home contract in spite of the contractual conflict or to have insufficient work for its employees"), *id.* 172 U.S.App.D.C. at —— – ——, 521 F.2d at 932–933 (dispute cannot logically be with subcontractor, who cannot meet demands); *id.* 172 U.S. App.D.C. at ——, ——, 521 F.2d at 934, 941 & nn.66 & 74.

**38.** The Board, apparently cognizant of the inequities produced by its right to control doctrine in a case such as the present one, indi-

cates that "the doctrine does not foreclose a union from enforcing a work preservation provision against an employer who lacks control of the work through a lawsuit or contractual arbitration procedures." Brief for the NLRB at 5 n.4, *citing Koch. See also* dissenting op., 172 U.S.App.D.C. at —— ——, 521 F.2d at 938–941 & nn.66, 95, 101, 106. *Koch,* in suggesting that the union's "remedy may well lie in a civil suit for breach of contract," *see* 201 NLRB at 63, cited *Local 1976, Carpenters v. NLRB [Sand Door],* 357 U.S. 93, 108, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), as support for that position. (Nor does the dissent cite any additional support.) It is sufficient to observe that the suggestion—that an agreement to preserve work from *nonjobsite* prefabrication is legal and enforceable in court even though it obligates the employer to do that which the union could not exert economic pressure to force the employer to do—is completely untenable in light of the congressional overruling of *Sand Door* by the passage of § 8(e) and the *National Woodwork* Court's formulation of the *in pari materia* relationship of §§ 8(e) and 8(b)(4)(B). *See* 386 U.S. at 644–45, 87 S.Ct. at 1268 (majority opinion); *id.* at 649, 87 S.Ct. at 1271 (memorandum of Mr. Justice Harlan) ("§ 8(e), it is agreed, is to be taken *pari passu*" with § 8(b)(4)(B)); *id.* at 660, 87 S.Ct. at 1276, *quoting Ohio Valley Carpenters,* 136 NLRB 977, 987 (1964) (Stewart, J., dissenting) ("there is little point and no logic in declaring an agreement lawful under 8(e), but in finding its enforcement condemned under 8(b)(4)(B)").

It is thus inescapable that approval of the Board's right to control test necessarily would preclude a successful union suit for breach of a work preservation agreement whenever the employer who breached the agreement did not have legal control over the work the union desired preserved. *See, e. g., Associated General Contractors of California, Inc. v. NLRB, supra* note 3. For employees dealing with employers regularly in such a position, collective bargaining and other concerted efforts to protect their traditional work and income from "onrushing technological change," *see Nation-*

### B.

In its brief to this court, the Board vigorously asserts that *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1234 (1951), mandates a different conclusion than the one we have reached. We find that this reliance on *Denver* is misplaced. The *Denver* Court sustained a Board finding that a construction union had violated Section 8(b)(4)(B) by striking against a general contractor in order to force him to terminate his contract with a subcontractor who employed nonunion labor—a classic secondary boycott. In the course of its opinion the *Denver* Court in dicta made several statements which the Board in its brief now maintains establish principles upon which the right to control test can be based:

> If there had been no contract between Doose & Lintner [the general contractor] and Gould & Preisner [the nonunion subcontractor] there might be substance in [the union employees'] contention that the dispute involved no boycott. If, for example, Doose & Lintner had been doing all the electrical work on this project through its own nonunion employees, it could have replaced them with union men and thus disposed of the dispute. However, the existence of the Gould & Preisner subcontract presented a materially different situation. The nonunion employees were employees of Gould & Preisner. The only way that respondents [the union employees] could attain their purpose was to force Gould & Preisner itself off the job. This, in turn, could be done only through Doose & Lintner's termination

of Gould & Preisner's subcontract. The result is that the Council's strike, in order to attain its ultimate purpose [full unionization of the construction site], must have included among its objects that of forcing Doose & Lintner to terminate that subcontract. * * * It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract.

341 U.S. at 688–89, 71 S.Ct. at 951, *quoted in* brief for the NLRB at 8–9 (emphasis in original). Although this language obviously does not constitute a holding endorsing the Board's right to control doctrine since the general contractor in *Denver* had full legal power to assign the work which the union did not want nonunion employees to perform, the Board argues that this language should be applied in the instant case. The union's ultimate objective of work preservation, the argument runs, could only be attained by keeping Slant/Fin from completing the internal piping; this, in turn, could be done only through Austin's termination of its contract with Slant/Fin; the union's refusal to install the units must therefore have included among its objects that of forcing Austin to terminate the Slant/Fin contract; and such an objective would, given the dicta from the *Denver* opinion, render the refusal to install the units an illegal secondary boycott under Section 8(b)(4)(B).

As we have already indicated, we do not agree that termination of the Slant/Fin contract was a necessary intermediate step to satisfaction of the union's ultimate objective; Hudik-Ross could have resolved the dispute without

*al Woodwork,* 386 U.S. at 640, 87 S.Ct. at 1266, would be substantially undermined. Though we do not necessarily believe that the tug and pull of collective bargaining and concerted economic activity provide the ideal means to accommodate the job and income security of American laborers with the efficiencies of automation, we no more than the *National Woodwork* Court can say that Congress, without debate and study, intended by its enactment of §§ 8(e) and 8(b)(4)(B) to block this traditional and legislatively protected approach to such a serious industrial rela-

tions problem. *See generally,* 386 U.S. at 640–44, 87 S.Ct. 1266–70. And although the dissenters insist that our decision "increases the costs of construction projects suited to pre-prepared components," dissenting op., 172 U.S.App.D.C. at ——, 521 F.2d at 941, the *National Woodwork* Court has instructed us that such "economic and technological factors * * * are addressed to the wrong branch of government. * * * [Such arguments should be left] for Congress." 386 U.S. at 644, 87 S.Ct. at 1269.

affecting the contractual relationships of either Austin or Slant/Fin. But even accepting the factual premises of the Board's analysis, the quoted *Denver* language does not support the Board's right to control test. For a literal application of that language would have outlawed even the union activity in *National Woodwork,* where the struck employer was a general contractor with full legal control over assignment of the work in dispute. In *National Woodwork* the carpentry union's objective of work preservation was only obtained by the general contractor's termination of his contract to purchase prefabricated doors from one of the Woodwork Association's members. But the *National Woodwork* Court, in upholding the union's actions, clearly did not consider this to be a proscribed secondary objective; indeed, that Court did not find it necessary to even consider the quoted *Denver* language.[39]

A closer examination of the *Denver* opinion reveals why that case was inapposite to both *National Woodwork* and the present case. The Board's quotation of *Denver* is less than candid, and reveals the danger of reducing a complex analysis turning upon "all the surrounding circumstances" into a simplistic *per se* doctrine. For the above paragraph from *Denver* was introduced by this observation:

> In the background of the instant case there was a longstanding labor dispute between the Council and Gould

& Preisner due to the latter's practice of employing nonunion workmen on construction jobs in Denver.

341 U.S. at 688, 71 S.Ct. at 951. The Court, looking to the whole factual context of the controversy, thus recognized that the union pressure was directed against the labor relations practices of the subcontractor, and that the strike against the general contractor was "tactically calculated to satisfy union objectives elsewhere."[40] In *National Woodwork,* as in our case, there was no indication that the substance of the dispute was with a third party. Given *National Woodwork* and the 1959 proviso added to § 8(b)(4)(B), the mere fact that the primary employer, in order to settle the dispute between himself and his employees concerning his "labor relations * * * vis-à-vis his own employees,"[41] might be forced to terminate his contract with such a third party cannot alter this conclusion.[42]

### III

We do not think that an employer who is struck by his own employees for the purpose of requiring him to do what he has lawfully contracted to do to benefit those employees can ever be considered a neutral bystander in a dispute not his own.[43] We recognize, of course, that a strike may have more than a single objective and may thus violate Section 8(b)(4)(B) if even one objective is a prohibited secondary one.[44] However,

---

**39.** The dissenters in *National Woodwork* felt that *Denver* supported the prohibition of *all* work preservation clauses. *See* 386 U.S. at 651, 87 S.Ct. at 1271. Clearly the majority rejected this argument.

**40.** *National Woodwork,* 386 U.S. at 644, 87 S.Ct. at 1268.

**41.** *Id.* at 645, 87 S.Ct. at 1268.

**42.** We also note that both here and in *National Woodwork* the union was applying economic pressure to enforce a valid contractual provision between its members and their employer. In *Denver* action was not taken pursuant to any lawful bargaining agreement.

**43.** "Strongly held opposing views have invariably marked controversy over labor's use of the boycott to further its aims by involving an

employer in disputes not his own. But congressional action to deal with such conduct has stopped short of proscribing identical activity having the object of pressuring the employer for agreements regulating relations between him and his own employees." *National Woodwork,* 386 U.S. at 620, 87 S.Ct. at 1255.

**44.** The Board maintains that this circuit and those other courts which have rejected the right to control doctrine have improperly converted the search for proscribed union activity from an analysis of whether *an* object of the union is secondary to an analysis of whether the *principal* object of the union is secondary. *See* brief for the NLRB at 27–28. The Board thus criticizes these courts because they "seem to conclude that if the union is seeking to enforce a valid work preservation clause

we hold that in situations such as the present one, where there is a valid work preservation provision in a collective bargaining agreement and where a union refuses to acquiesce in an employer's violation of that agreement, it is reasonable to assume that the employer *can* comply in accordance with his prior commitment to his workers and that, absent more evidence than mere stoppage of work, the union's objectives are legitimate and the refusal to install the prefabricated materials is lawful.

 We therefore conclude that in this case, as in *National Woodwork,* the union's refusal to install the prefabricated components must be deemed primary concerted activity not prohibited by Section 8(b)(4)(B) if it is determined, "under all the surrounding circumstances,"[45] that the sole objective of the union was to preserve for employees of the struck employer work they traditionally performed. Since the Board here found that the union's purpose was to preserve work which Hudik-Ross' employees had traditionally performed, and there is no substantial evidence, as distinguished from the Board's rationalizations, in this record that the union's purpose was also "to satisfy union objectives elsewhere," the Board's decision holding the union guilty of a Section 8(b)(4)(B) violation may not stand. However, in remanding in *Local 742, supra,* and *Local 636, supra,* we held that legal control in the struck employer over assignment of the work

against the employer who signed it, then in every instance, *without further inquiry,* such activity is primary because motivated by a work preservation objective and enforced against the immediate employer." *Local 438, Plumbers & Pipe Fitters, supra* note 4, 201 NLRB at 62 (footnote omitted; emphasis added). *See also, e. g.,* dissenting op. 172 U.S. App.D.C. at ————, 521 F.2d at 934–935 & nn.87 & 102. We must respectfully inform the Board that it has totally misunderstood the import of our prior decisions and, we presume, those of our sister circuits. Admittedly, the Board's statement is correct to the extent that under those circumstances we presume, absent evidence to the contrary, that the union's activity is primary and lawful and that the employer's mere lack of legal control over the work does not overcome that presumption. It is also true that, when the pressure is exerted solely against the immediate employer, we would consider termination of the subcontract or the general contractor's contract with the manufacturer to be acceptable ancillary effects of the primary action. However, even when we find that the union's primary motivation is work preservation, we will hold its actions unlawful under § 8(b)(4)(B) if they are tainted by secondary objectives. Several examples can illustrate the differences of such situations from the present case.

The first situation would be one in which the union, in furtherance of a work preservation agreement with a subcontractor, not only refuses to handle prefabricated goods, but also exerts pressure directly against the general contractor to terminate its contract with the manufacturer. *Cf. NLRB v. Local 825, Operating Eng'rs [Burns and Roe],* 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). In such cases, it would be appropriate to consider the general contractor to be a neutral party since he should not be forced to investigate the collective bargaining agreements of each of his subcontractors and since he could presume that they would resolve their own disputes with their own employees.

A second situation would be one in which the union discriminates in its work preservation tactics on the basis of the organizational status of the manufacturer. For example, when a dispute arose over work preservation and the disputed work was performed by an affiliated labor organization, the union may have only sought compensatory pay and submitted the dispute to arbitration. Yet in similar circumstances, when the manufacturer's employees were nonunionized, the union may have struck against its employer, hoping it would pressure the general contractor to terminate the manufacturer's contract. Given such facts, the valid work preservation objective could be held to be tainted by the improper secondary objective.

We recognize that such secondary objectives will not often be found when the union's principal objective is work preservation. We merely wish to demonstrate that we are cognizant of the statutory mandate and that we will hold such secondary objectives to be unlawful should they be detected. However, given the Supreme Court's approval of work preservation clauses in *National Woodwork,* and the policy of allowing contending parties to support their demands through economic pressures, we do not find that a work preservation action such as the one in the present case necessarily has *per se* any unlawful secondary objective, although it may have severe effects on neutral employers.

**45.** 386 U.S. at 644, 87 S.Ct. at 1268.

which a union professes a desire to preserve, while not alone dispositive, may be considered by the Board along with other factors suggested by the *National Woodwork* Court in determining the union's actual objective. In remanding here to give the Board an opportunity to reconsider its ruling in this case,[46] we emphasize at the risk of repetition that the Board is not free to focus on Hudik-Ross' lack of control to the total exclusion of the circumstances which the *National Woodwork* Court stated might be relevant to the inquiry into the union's objective.[47] The Board may fashion its own formulations as to the relevance of certain facts to *National Woodwork*'s test for distinguishing primary from secondary activity. But as we held in *Local 742, supra,* and *Local 636, supra,* the Board may not transform that test, directly or indirectly, into a vehicle for subverting the congressional purpose by focusing on only one among many potentially relevant factors.

*Remanded for further proceedings.*

BAZELON, Chief Judge (concurring):

I concur in Part III of the Court's opinion, in the bulk of its reasoning and in its judgment that the Board's "right to control" test is inconsistent with *National Woodwork Manufacturing Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). My path to this conclusion makes it unnecessary for me to consider certain issues raised by the Board in its argument[1] and considered in the Court's opinion.

### I.

The central dilemma presented by § 8(b)(4) is well known and needs no extended recital. The section purports to prohibit any inducement to force an employer "to cease doing business with any other person."[2] However, the objectives of every strike or job action "include a desire to influence others from withholding from the employer their services or trade."[3] The union by striking always wants to completely shut down the employer and cause the economic injury pursuant to that shut down. Similarly, the union is surely aware and must intend that those who are cut off from the employer's services by the strike will also be injured and that injury might well create a climate in which the union's demands will be met. For example, in a strike of the trucking industry, the hardest hit will be not the trucking industry but the producers of perishable commodities. The union surely intends that and surely expects that injury to help its cause. The strike weapon is not a mere contrivance of the courts nor is it permitted through legislative inaction. The strike weapon is explicitly preserved by Sections 7 and 13 of the NLRA. More than this, that weapon forms the base for the system of

---

**46.** For example, such a reconsideration might challenge the Board's assumption that the union was not in fact attempting to organize the Slant/Fin employees.

**47.** The *National Woodwork* Court stated that the relevant "circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry. See Comment, 62 Mich.L.Rev. 1176, 1185 *et seq.* (1964)." 386 U.S. at 644 n.38, 87 S.Ct. at 1268. In its analysis of the evidence supporting the Board's finding that the carpentry union's ultimate objective was work preservation, the Court stressed that the union "refused to hang prefabricated doors whether or not they bore a union label, and even refused to install prefabricated doors manufactured off

the jobsite by members of the Union." *Id.* at 646, 87 S.Ct. at 1269. In short, the substance, history, and motivation of the particular dispute must be examined, with particular emphasis on identifying the employer whose *labor relations* are being affected.

**1.** *See* Brief for the NLRB at 8–10. This question pertains to the effect of a subsidiary holding in *Denver Bldg. & Construc. Trades Council v. NLRB,* 341 U.S. 675, 689 -90, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) on the situation *sub judice.*

**2.** National Labor Relations Act § 8(b)(4)(ii)(B), 29 U.S.C. § 158(b)(4)(ii)(B) (1970).

**3.** *Local 761, Electrical Workers v. NLRB,* 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961) (Frankfurter, J.). For this reason the oft-cited language in S.Rep.No.105, 80th

private ordering the NLRA promotes.[4] To forbid the use of this weapon or permit a reduction of its effectiveness without explicit legislative approval would radically shift the balance of advantage struck by Congress between union economic power and employer economic power. Courts were and are naturally hesitant to alter that balance and thus, with the Labor Board, sought to accommodate the right to strike with the prohibition on secondary boycotts.

The accommodation between Sections 7 and 13 and Section 8(b)(4) which the Board urges upon us focuses on the union's "secondary intent." If a union has an "intent" to achieve the secondary effects occasioned by its strike otherwise protected by Sections 7 and 13, then it follows that the union has engaged in a § 8(b)(4) "secondary boycott." If the union does not intend to achieve those effects but rather seeks only to achieve effects on the primary employer, then the strike is "primary" and not violative of § 8(b)(4). In the Board's words: "While not prohibiting 'the *incidental* effects of *traditional primary activity*,' Congress by Section 8(b)(4)(B) has 'barred as a secondary boycott union activity directed against a neutral employer, *including the immediate employer* when in fact the activity directed against him was carried on for its effect *elsewhere*.' . . . If a 'tactical object' of the union's conduct is a person other than the employer of the boycotting employees, the 'boycott [is] secondary in its aim.' "[5]

A moment's reflection will suggest the difficulty with this formulation. The union surely intends the secondary effects of all strikes. That secondary effect is part, indeed, in some cases the only operative part of the strike weapon. This observation, rejoins the Board, citing dicta in *Denver Building and Trades*,[6] proves it is correct here in finding Local 638's activity was secondary, since "an object" (the precise statutory phrase of § 8(b)(4) of Local 638's job action was to put pressure on the general contractor through a strike of its own employer, the "secondary", to force it to terminate business with the general. The obvious response is that this reasoning taken literally would outlaw all strikes, exactly what the "union intent" accommodation seemingly was designed to prevent. A union always intends that employers other than the immediate employer will be pressured by its strikes or job actions.

The Board attempts to limit the far reaching effect of its reasoning by applying it only when the primary employer has no "right to control" assignment of disputed work in work preservation controversies. The Board argues that in this limited situation it can reasonably presume that the union's economic pressure on the primary employer is intended to particularly affect the employer who does have the right to control assignment of the disputed work. The union's object must then be to pressure the employer who does have this right to control to satisfy the union's objective.

Cong., 1st Sess. 22 (1947) is hopelessly conclusory.

4. *See, National Woodwork Manuf. Ass'n v. NLRB*, 386 U.S. 612, 640–43, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 234–35, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 490, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); N. Chamberlain & J. Kuhn, Collective Bargaining 391 (2d ed. 1965). *Cf. American Radio Ass'n v. Mobile Steamship Ass'n*, 419 U.S. 215, 95 S.Ct. 409, 424, 42 L.Ed.2d 399 (1974) (Stewart, J., dissenting), *quoting* Local 20, *Teamsters v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

5. Brief for the NLRB, at 7 *citing National Woodwork Manuf. Ass'n v. NLRB*, 386 U.S. 612, 632, 645, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). *See* Lesnick, *Job Security and Secondary Boycotts*, 113 U.Pa.L.Rev. 1000, 1015–18 (1965) for a leading academic formulation of the "union intent" test.

6. *Denver Bldg. & Construc. Trades Council v. NLRB*, 341 U.S. 675, 688, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Of course, the Court is quite correct in noting on pages —— —— of 172 U.S.App.D.C., on pages 898–899 of 521 F.2d that the Board has cavalierly lifted this *dictum* from its context. The literal import of the *dictum* is thus of absolutely no aid in resolving the issues presented in this case.

This formulation essentially limits the Board's reasoning to the construction industry.[7] The Board asks us to accept this reasoning as based upon its expertise in ascertaining union objectives and evaluating union conduct.

But can the Board's reasoning be limited to situations in which the struck employer has no right to control the disputed work? Assume the immediate employer *does* have the right to control assignment of the work. A strike to force him to exercise that discretion, i. e. change his purchasing policies, to assign the work to his employees has exactly the same effect as a strike to force him to stop doing business with an individual who, in the situation in which the immediate employer has *no* right to control, would have the discretion to assign the work to the disputing employees. We have consistently held that a strike to force a termination of business is no different from a strike to force a change in purchasing policies;[8] the language of the statute and common sense clearly support that view.[9]

If the secondary effects of a strike of or job action against a primary employer are equal when the employer has right to control and when he does not have right to control, why is it that the union does not "intend" the secondary effects in the first situation but does in the second? Surely, the Board will not be heard to argue that since the primary employer can legally "satisfy" the union's demand in the first situation, the presumption as to "intent" is not applicable. The employer who has no right to control can also legally satisfy the union's demand by terminating the offending contract or paying off the union for its lost wages. Similarly, as the general contractor in the non-right to control situation can satisfy the union's demands by changing his own purchasing policies, so the manufacturer in the right to control situation can satisfy the union demands by constructing heating and cooling units such that threading and fitting is done on the job or by going out of business.

To this argument, I take it, the Board's only possible response is that its experience with union actions in the construction industry convince it that (a.) the union is unconcerned with any secondary effect on a manufacturer, when the union's employer can assign it the work in dispute, but (b.) is specially and vitally concerned with the secondary effect on an employer who could assign the disputed work to the union. But surely the Board does not argue that the union does not intend that the manufacturer feel *no* effects of economic pressure on a right to control employer; nor by its own admission in this case does it argue that the union is specifically seeking to bargain with an employer who

7. The Board seems unaware of this fact and of the serious problems such an approach raises in terms of the over-all equity of the NLRA. It is largely for this reason that I would, if I were writing on a clean slate, adopt the views of Judge Fahy stated in *Denver Bldg. & Construc. Trades Council v. NLRB,* 87 U.S.App.D.C. 293, 186 F.2d 326, 335–37 (1950), *rev'd,* 341 U.S. 675, 689–90, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Judge Fahy's opinion would accommodate the peculiar structure of the construction industry to the intendment of § 8(b)(4). *See also* note 20 *infra.*

8. *See, e. g., Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 321 F.2d 366, 369 (1963), *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1964).

9. *See* National Labor Relations Act § 8(b)(4)(ii)(B), 29 U.S.C. § 158(b)(4)(ii)(B) (1970): " . . . forcing or requiring any person to cease . . . handling . . . the products of any other . . . manufacturer . . . ."

For this reason the statement in H.R.Rep.No. 245, 80th Cong., 1st Sess. 23 (1947), cited by the Brief for the NLRB at 9–10 n. 5 and relied upon in *Local 419, Carpet Layers v. NLRB,* 151 U.S.App.D.C. 338, 467 F.2d 392, 357 (1972), is not helpful in resolving the issues of this case. That statement is that Congress meant to protect employers who are "powerless to comply with demands giving rise to [secondary] activity. . . ." However, even if we were to assume that Hudik-Ross is a secondary, it certainly can comply with the union's demand by terminating business with Austin, just as a right to control employer can comply by altering his purchasing policies.

does have the right to control when the union's immediate employer does not. It is difficult to perceive how the Board's gradation of union intent can serve as any kind of a rational or definitive standard to distinguish a § 8(b)(4) violation: in both cases the union "intends" the secondary effect and surely makes use of that effect to gain its objective. It may be in other industries that the secondary effects of a strike are less important to a union than in, for example, the trucking industry. Does that make strikes in the trucking industry "secondary" and strikes in other industries "primary"? In any event, the Board has presented us with no record that unions in the construction industry are particularly inclined to manipulate the secondary effects of their primary strikes more in a non-right to control situation than in a right to control situation. Such a conclusion is not intuitively obvious to me: my own suspicion is that the unions intend to force everybody, everywhere to recognize their right to traditional jobs and if a strike of their primary employer pinches some other entity which is ignoring the union's "right" then so much the better from the union's point of view. Thus, I am unwilling to rely on the Board's conclusory allegations of expertise when the illogic of its position is not overcome by a record supportive of that position. In these circumstances, I cannot conclude that the Board has successfully demonstrated that there is any distinction between the union's intent in situations in which the immediate employer has the right to control and the situation in which that employer does not.

My conclusion in this regard is buttressed by another consideration. Clearly, a union strike over failure to agree to an increase in wages or failure to comply with such an agreement does not become secondary activity simply because the employer's ability to pay is practically dependent on the price he himself receives from a third party. Yet only the third party has the "right to control" resolution of the dispute and thus, under the Board's reasoning, the immediate employer is a "secondary." The Board seeks to avoid this intuitively absurd result by stating that the inability to satisfy union demands must be "legal" not "practical" [10] in order to support the right to control test. But what principles support this distinction? One searches in vain. Indeed, the distinction between "practical" and "legal" power, never the most obvious of distinctions in the non-legal world, is attenuated to the point of disappearance when, as here, the "legal" inability of the immediate employer is caused by his own "practical" estimations as to the profit in entering a subcontract in derogation of his work preservation agreement. If the union decides, as an employer might well importune it to decide, to agree to a monetary settlement in lieu of compliance with the work preservation agreement, the immediate employer may find it necessary to seek aid from the general contractor in order to get the job moving. Can the Board really distinguish between "practical" and "legal" control over a labor dispute?

If the Board's presumption of secondary intent when the employer has no right to control is extended to situations in which the employer does have the right to control—as, in logic, it must be extended, as discussed above—the right to control presumption becomes not an accommodation between § 8(b)(4) and §§ 7 and 13 but rather an administrative repeal of the right to strike.[11] The

10. See Local 1694, ILA (Bd. of Harbor Comm'rs), 137 N.L.R.B. 1178, 1182–83 (1962), aff'd, 331 F.2d 712 (3d Cir. 1965). Cf. Local 438, Plumbers & Pipefitters (George Koch Sons), 201 N.L.R.B. 59, 62 (1973), aff'd, 490 F.2d 323 (4th Cir. 1973).

11. The Board is apparently waffling on the question of whether the union may strike the

general contractor who in circumstances as those sub judice has the right to control. It first held that the union did have that right but the 9th Circuit rejected that holding on appeal. See Western Monolithics Concrete Prod., Inc. v. NLRB, 446 F.2d 522 (9th Cir. 1971). This Board position apparently motivated the refusal to issue a complaint in Connell Construc. Co. v. Local 100, Plumbers & Steamfitters, 421

Chamber of Commerce in its *amicus* brief quite unabashedly presses upon us that contention; job site strikes over work preservation issues should be outlawed because of their disruptive effect. While I must commend the Chamber for its honesty of presentation, its argument was over-ruled in the most explicit terms in *National Woodwork* [12] and upon reflection is really no more than the old, discredited contention bandied about in

the days prior to the Norris-LaGuardia Act. Accepting the Chamber's position would re-introduce the labor injunction through the fragile vehicle of § 8(b)(4) and § 10(*l*). It is simply incomprehensible that Congress would intend such a result without altering Norris-LaGuardia or Sections 7 and 13; in any event, I for one would not bring back the doctrine of *Coronado* (II) and *Bedford Cut Stone* [13]

U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), *rev'g,* 483 F.2d 1154, 1158 (5th Cir. 1973) and was implicitly rejected by the Supreme Court's holding. The Board's apparent position seems manifestly inconsistent with the Act, *see* 172 U.S.App.D.C. pp. —— ——, 521 F.2d pp. 892–893 *infra,* and, as the Court notes in note 29, would seem to expand rather than contract the scope of labor disputes in contravention of the stated goal of § 8(b)(4). Thus, we are forced to the conclusion that when the immediate employer has no right to control, the union is deprived of the right to strike. This cannot be squared with Sections 7 and 13.

The Board offers solace to the union by stating that the union may enforce its contractual agreement with its immediate employer in a § 301 suit. *See Local 438, Plumbers & Pipefitters (George Koch Sons),* 201 N.L.R.B. 59, 63 (1973), *aff'd,* 490 F.2d 323 (4th Cir. 1973). Thus, the Board implies that the scope of § 8(b)(4) is broader than that of § 8(e). The Court in note 38 correctly notes that both the majority and dissent in *National Woodwork* held that § 8(b)(4) and 8(e) were to be construed *in pari passu.* Furthermore, the Board's position raises the intriguing question of whether the union may strike to require the immediate employer to pay damages for violating the concededly valid work preservation agreement. The only minimal rationality to the Board's position is provided by our recent holding in *Local 223, Sheet Metal Workers v. NLRB,* 162 U.S.App.D.C. 145, 498 F.2d 687 (1974) which held that the validity of a work preservation agreement could only be determined at its inception. The Board could argue that since the work preservation agreement is valid and a later specific secondary intent could not void it, the courts should permit § 8(b)(4) findings in such situations to preserve the intent of § 8(b)(4). The most obvious response is that Judge Wilkey's opinion for the Court in *Local 223* does not hold that an agreement originally valid under § 8(e) may be *enforced* in all circumstances, only that the agreement itself cannot be *voided* because of one incident of secondary intent in enforcing that agreement. I conclude, as does the Court, that the Board must either completely outlaw

the union's action or completely protect it. The Board is not authorized to initiate under §§ 8(b)(4) and 8(e) a compulsory arbitration scheme for the construction industry. That is a project for management and labor to resolve in collective bargaining. The Board's implied response that § 8(e)'s construction industry proviso should cover disputes of the sort we confront in this case must be rejected. *See* note 22 *infra.*

While the Board does not explicitly make the argument, one could argue that the principle of *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) should permit the Board to extend the compulsory arbitration schemes specifically approved in §§ 8(b)(4)(ii)(D), 10(k), 29 U.S.C. §§ 158(b)(4)(ii)(D), 160(k) (1970) (compulsory arbitration of work assignment and jurisdictional disputes) and in the construction industry proviso to § 8(e) (union and employer may agree to hot cargo clause but the clause may not be enforced through a strike if the subject of the agreement relates to job site work) to the facts of this case. I am not impressed with this potential argument since it restricts the right to strike by implication. Such restriction was permitted in *Lucas Flour* because of the union's own agreement to a plenary arbitration scheme. There is no such agreement in this case. *See* Wellington & Albert, *Statutory Interpretation and the Political Process: A Comment on Sinclair v. Atkinson,* 72 Yale L.J. 1547 (1963). *See also Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 388, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) (Douglas, J., dissenting); *Banyard v. NLRB,* 164 U.S.App.D.C. 235, 505 F.2d 342 (1974).

12. *National Woodwork Manuf. Ass'n v. NLRB,* 386 U.S. 612, 644, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

13. *See Coronado Coal Co. v. United Mine Workers,* 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1925); *Bedford Cut Stone Co. v. Journeymen Stone Cutters Ass'n,* 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927). *See generally* Winter, *Collectively Bargaining and Competition: The Application of Anti-trust Standards to Union Activities,* 73 Yale L.J. 14 (1963); note 21 *infra.*

without the most explicit Congressional statement that such was demanded by dictates of sound economic policy. Finally, the Board's right to control test must be rejected because the Supreme Court in *National Woodwork* expressly held that the union could use economic pressure for work preservation against an immediate employer who does have the right to control. As discussed above, there is no distinction between economic pressure against an immediate employer who does have the right to control and one who does not that is relevant to the purposes of § 8(b)(4). Therefore, *National Woodwork* requires us to reverse the Board's action as arbitrary and as inconsistent with the Act.[14]

## II.

Having said all this, I think it appropriate to make some brief remarks about what *is* proscribed by § 8(b)(4). That is not an easy task since the 80th Congress which passed that provision did not specify what the provision was meant to outlaw. All who read the Section agree it can not be taken literally. All who know the history of the Taft-Hartley Act realize that Congress surely meant to outlaw something that unions were engaged in. The project for the courts and the Board has been to formulate the scope of § 8(b)(4)'s proscription. It is instructive to consider the two areas in which the Board and the courts have with some exactitude delineated the scope of § 8(b)(4).

The first area involves those cases in which the union directly seeks to obtain a concession for a specific group of employees from an employer with whom it has no bargaining relationship under the NLRA *relating to those specific employees*.[15] An example would be where a union pickets an employer with whom it has no collective bargaining agreement to prevent that employer from doing something that would affect the union. In such cases the union is in effect seeking to bargain with the third-party employer. When § 8(b)(4)'s proscription is stated in those terms, it is easily reconciled with the NLRA and particularly the Taft-Hartley Act as a whole. Such an attempt by the union to bargain with an employer, with whom it has no collective bargaining relationship in relation to the affected employees, would conflict with the policy of the Act of free choice for the actual employees of the employer so importuned as to whether they wish to be represented by a union; would conflict with the employer's actual or potential duty to bargain with his own employees; and could conflict with the union's concomitant duty to represent those employees. The employer may thus be

14. The sort of judicial review of administrative action involved in this case is not really a direct ruling on a "question of law"; nor is it a ruling on a matter outside of the agency's expertise. Rather it is a ruling that the agency in exercising its expertise in an area of mixed facts and law did not act reasonably in developing a rational interpretation of the Act. This form of judicial review is largely supervisory and should be sparingly used. *Cf. Local 761, Electrical Workers v. NLRB,* 366 U.S. 667, 672–74, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

15. *See NLRB v. Local 825, Operating Eng'rs,* 400 U.S. 297, 303–04, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *Local 814, Teamsters v. NLRB,* 167 U.S.App.D.C. 387, 512 F.2d 564 (1975); *Local 419, Carpet Layers v. NLRB,* 151 U.S. App.D.C. 338, 467 F.2d 392 (1972); *Local 1288, Retail Clerks v. NLRB,* 129 U.S.App.D.C. 92, 390 F.2d 858 (1968). *Cf. Local 761, Electrical Workers v. NLRB,* 366 U.S. 667, 674–79, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); *Connell Con-*

*struc. Co. v. Local 100, Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). *See also American Radio Ass'n v. Mobile Steamship Ass'n,* 419 U.S. 215, 95 S.Ct. 409, 420–21, 42 L.Ed.2d 399 (1974) (Stewart, J., dissenting). The Court in note 44 recognizes this rule. *Compare* this rule *with United Mine Workers v. Pennington,* 381 U.S. 657, 665–66, 85 S.Ct. 1585, 1591, 14 L.Ed.2d 626 (1965):

But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on *other bargaining units.* . . . [T]here is nothing in the labor policy indicating that the union and the employers in one bargaining unit are free to bargain about the wages, hours and working conditions of other bargaining units . . . .. On the contrary, the duty to bargain unit by unit leads to a quite different conclusion. (emphasis added)

forced to bargain with two unions and the union who seeks to force bargaining must represent two work forces, which may or may not have conflicting interests.[16] The interloper union thus finds no protection in the Act for his bargaining. Indeed, one could construe such a bargaining attempt as a petition for recognition which is itself illegal unless done in conformity with the rather specific provisions of the Act governing recognitional activity.[17]

These same general policies of the Act may also explain the other area in which the courts and Board have reached agreement on the scope of § 8(b)(4)—any union attempts to obtain from its immediate employer an agreement to or practise of refusing to handle non-union goods or to work on jobs where non-union workers will be present violate § 8(b)(4).[18] Professor Lesnick criticizes these cases because they are insensitive to the subtleties of "union intent."[19] However, that criticism ignores what I perceive to be the real import of this

rule. A union objective to promote unionization or for "aesthetic" reasons to refuse to handle non-union goods even if directed solely at the primary employer (although I would argue no union objective ever is in *intent*) is not protected by the Act since the Act is neutral toward unionization and affirmatively seeks to protect employee freedom of choice in deciding upon union representation. The union's objective, not its "intent" to make tactical use of secondary effects, is illegal and "secondary" as a matter of law.

The relation of the proscription of § 8(b)(4) to the general policies of Taft-Hartley and the NLRA provides a more firm structure to the secondary boycott provisions, one more easily complied with and one more readily administered. It furthermore has the salutory effect of enhancing Congress' role as the ultimate arbiter of union power and employer power in the collective bargaining process. With attention thus directed to the *substantive desirability* of the union's

**16.** *Cf. United Mine Workers v. Pennington*, 381 U.S. 657, 665–66, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Local 419, Carpet Layers v. NLRB*, 151 U.S.App.D.C. 338, 467 F.2d 392, 406–07 (1972); *Sperry Systems Mgmt. Div. v. NLRB*, 492 F.2d 63, 69 (2d Cir.), *cert. denied, sub nom., Local 445, Electrical Workers v. Sperry Systems Mgmt. Div.*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974). The one exception to this rule is the "allied employer" doctrine, *see* cases cited 467 F.2d at 401 n.20, which the Board seemingly recognizes as a limitation on its "right to control" rule. *See Painters Dist. Council No. 20*, 185 N.L.R.B. 930, 932 (1970).

**17.** National Labor Relations Act § 8(b)(7), 29 U.S.C. § 158(b)(7) (1970); *see San Francisco Local Jt. Exec. Bd., Culinary Workers v. NLRB*,163 U.S.App.D.C. 234, 501 F.2d 794 (1974); Note *Recognitional and Organizational Picketing: Limitations on A Non-Certified Union*, 47 Minn.L.Rev. 1031 (1963). Of course, if the union does not represent a majority of the relevant employees, any bargaining would violate § 8(a)(2), 29 U.S.C. § 158(a)(2) (1970). *Compare Dallas Building Trades v. NLRB*, 130 U.S.App.D.C. 28, 396 F.2d 677 (1968).

**18.** *Washington-Oregon Shingle Weavers Dist. Council*, 101 N.L.R.B. 1159 (1952), *aff'd*, 211 F.2d 149 (9th Cir. 1954); *see Denver Bldg. & Construc. Trades Council v. NLRB*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). *See*

*also Local 636, Plumbers & Pipefitters (I) v. NLRB*, 108 U.S.App.D.C. 24, 278 F.2d 858 (1960); *Marriott Corp. v. NLRB*, 491 F.2d 367 (9th Cir.), *cert. denied sub nom. International Ass'n of Machinists v. NLRB*, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974); *Local 1976, Carpenters*, 113 N.L.R.B. 1210 (1955), *aff'd*, 241 F.2d 147 (9th Cir. 1957) *aff'd on narrow issue*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). The distinction between union signatory agreements such as discussed in the text and union standards agreements such as are in issue in this case has often been recognized by this Court. *See Orange Belt Dist. Council No. 48 v. NLRB*, 117 U.S.App.D.C. 233, 328 F.2d 534, 538–39 (1964) and cases cited. *See also Local 24, Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959). The Board's reliance on *Local 5, Plumbers & Pipefitters*, 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1964) is misplaced since that case involved a jurisdictional dispute between unions, which is substantially similar to a union signatory dispute. *Cf.* NLRA §§ 8(b)(4)(ii)(D); 10(k), 29 U.S.C. §§ 158(b)(4)(ii)(D); 160(k) (1970). *See also* NLRB v. Local 825, Operating Eng'rs, 400 U.S. 297, 305–06, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971).

**19.** Lesnick, *supra* note 5, at 1004–06.

bargaining objective, Congress may with the issue so framed give full consideration to the desirability of that objective in balance with its adverse secondary effects. On the other hand, if courts and the Board continue to focus on "union intent", Congress may be deterred from intervention by the heavily factual nature of the inquiry. The energies of management and labor will be spent on subtle questions of evidence while the central questions of the desirability of the objective as against its adverse effects will be submerged in judicial consideration of evidentiary presumptions such as the "right to control." A better institutional position for appellate courts is as a structuring agent, promoting rationalization and consistency in labor pol-

icy, and thereby framing issues for legislative and administrative consideration. The history of legislative-judicial-administrative dialogue is most impressive in those situations in which the judiciary considers the legality of a particular bargaining objective after the parties and the Labor Board have formulated the issue and either applies existing legislative policy to that objective or in effect "remands" the issue to Congress for action.[20] Finally, a relation of the proscription of § 8(b)(4) to the policies of the Taft-Hartley Act is probably the best approximation of the true intent of the 80th Congress in passing § 8(b)(4) while leaving Sections 7 and 13, not to mention Norris-LaGuardia, unscathed.[21]

**20.** *Cf.* Bickel & Wellington, *Legislative Purpose and the Judicial Process: The Lincoln Mills Case,* 71 Harv.L.Rev. 1 (1957).

Congress when confronted with properly framed issues may take two approaches. First, it may directly restrict union economic power when used in pursuit of a particular bargaining objective. *See* §§ 8(b)(4)(ii)(D); 10(k), 29 U.S.C. §§ 158(b)(4)(ii)(D); 160(k) (1970) (compulsory arbitration over work assignment and jurisdictional disputes); § 8(b)(7), 29 U.S.C. § 158(b)(7) (1970) (time limitation for organizational picketing and the right to have a Board regulated election); § 8(b)(1), (2), 29 U.S.C. § 158(b)(1), (2) (1970) (limitations of union security objectives); and the provisos to § 8(e), 29 U.S.C. § 158(e) (1970) (union may bargain for agreement not to handle non-union goods or work with non-union workmen but may not strike to enforce such an agreement).

Second, Congress may take steps to mitigate the more harsh effects of union economic power. *See, e. g.,* National Labor Relations Act § 208, 29 U.S.C. § 178 (1970); Railway Labor Act, 45 U.S.C. §§ 154–63, 183–85 (1970); C. Summers & H. Wellington, Labor Law 845–883 (1968).

The "institutional" view of the role of the courts suggested in the text would also seem to mitigate the difficulties of judicial application of the stated purpose of § 8(b)(4)—the protection of "neutral" third parties. *See, e. g., National Woodwork Manuf. Ass'n v. NLRB,* 386 U.S. 612, 627–28, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). These difficulties are illustrated by this case. The Board finds injury to neutral third parties in this case involving a small construction job in Brooklyn and proscribes that injury through § 8(b)(4). However, the Board would not and under current law could ·not

redress through § 8(b)(4) the very real injury to neutral third parties caused by a nationwide truckers strike or a local public employees strike. When one compares the relative seriousness of the injuries to neutral third parties, one must certainly pause to consider whether judicial effort to control secondary effects through § 8(b)(4) is a fruitless if not Sisyphisean task. The inherent inequity in this task is made doubly obvious in "Right to Control" work preservation disputes since construction unions are the only apparent object of § 8(b)(4) in such circumstances due to the peculiar structure of the industry. *See* note 7 *supra.*

**21.** *Cf.* National Labor Relations Act § 7, 29 U.S.C. § 157 (1970) ("Employees . . . shall also have the right to refrain from" collective bargaining); §§ 8(a)(1), (b)(1), 14(b), 29 U.S.C. §§ 158(a)(1), (b)(1), 164(b) (1970). *See also International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); notes 9 & 20 *supra.*

Another advantage of the view of § 8(b)(4) enunciated in the text is its correlation with anti-trust doctrine. This correlation has already been suggested in note 15 *supra.* It may also be seen in a comparison of *Local 189, Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *American Fed'n of Musicians v. Carrol,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); *Local 24, Teamsters v. NLRB,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) *and Local 1355, ILA (Tulse Hill),* 146 N.L.R.B. No. 100, *rev'd on other grounds,* 332 F.2d 992 (4th Cir. 1964); C. Summers & H. Wellington, Labor Law 652 (1968). *See also NLRB v. Wooster Div. of Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); Wellington & Winter, *The Limits of Collective Bargaining in Public*

As to the result in this case, I concur in Part III of the Court's opinion which establishes that if the union is striking its employer over the violation of a lawful collective bargaining agreement, the union may not be found in violation of § 8(b)(4) unless the objects listed in foot-

note 44 taint the union's strike. While I am less convinced than the majority that the Board deserves another opportunity to determine whether any of those objects tainted Local 638's strike, I concur in its reasoned judgment that a remand is the proper disposition at this time.[22]

*Employment,* 78 Yale L.J. 1107 (1969). The suggestion of this correlation is that if the union's substantive objective is within the scope of mandatory subjects of bargaining, it is exempt from both anti-trust and secondary boycott proscription. For another interesting comparison suggested in part by Professors Wellington and Summers, *compare Goldfinger v. Feintuch,* 276 N.Y. 281, 11 N.E.2d 910 (1937) *with Douds v. Metropolitan Fed'n of Architects,* 75 F.Supp. 672, 676–77 (S.D.N.Y. 1948) *and* the Court's opinion in this case. Indeed, the central definition of "secondary" intent for § 8(e) developed in *National Woodwork* and applied by this Court in *Local 223, Sheet Metal Workers v. NLRB,* 162 U.S.App. D.C. 145, 498 F.2d 687 (1974) is a result of the Supreme Court's construction of its *antitrust* opinion, *Allen Bradley Co. v. Local 3, Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). *See also Westinghouse Electric Corp.,* 150 N.L.R.B. 1574 (1965).

This correspondence between present anti-trust doctrine and § 8(b)(4), which focuses on the union's bargaining objective, is consistent with the common law position on secondary boycotts—that union boycott activity is illegal unless justified by a "privilege." *See Vegelahn v. Guntner,* 167 Mass. 92, 44 N.E. 1077 (1896); Holmes, *Privilege, Malice and Intent,* 8 Harv.L.Rev. 1 (1894). The NLRA which protects mandatory collective bargaining over certain subjects supplies the "privilege" which protects the union's boycott activities. *Compare Chicago Bd. of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) *and* cases cited S. Oppenheim & G. Weston, Federal Anti-Trust Laws 96–98 (1968) *with Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) *and United States v. Nat'l Ass'n of Real Estate Bds.,* 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950). Senator Taft stated expressly that the purpose of § 8(b)(4) was to "reverse the effect of the law as to secondary boycotts" by restoring the common law position. II Legislative History of the Labor Management Relations Act, 1947, at 1106 (1948).

The Supreme Court appeared to recognize the relation of § 8(b)(4) doctrine and anti-trust doctrine in *Connell Construc. Co. v. Local 100, Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). There the union engaged in seemingly flagrant secondary

activity, the Board refused to issue a complaint in an identical case involving the same union and a different subcontractor—either on the basis of its "right to control" doctrine or on the basis of an expansive view of § 8(e)— and the injured employer filed an anti-trust complaint. If anti-trust doctrine and secondary boycott doctrine are fully correlated, then an anti-trust cause of action can properly be viewed as a third party remedy when the Board refuses to issue a complaint. *Cf. W. J. Milner & Co. v. Local 349, Electrical Workers,* 476 F.2d 8 (5th Cir. 1973). *See also Connell Construction Co. v. Local 100, Plumbers & Steamfitters, supra* 421 U.S. at 647–50, 95 S.Ct. 1830 (Stewart, J., dissenting).

**22.** The Board makes one final implied argument. It is suggested that the construction industry proviso to § 8(e) by approving certain types of job sites agreements but forbidding economic pressure brought to enforce such agreements would be undermined by our holding in this case. By permitting economic pressure in support of an agreement which would fall under the proviso to § 8(e) if it involved an agreement with the general contractor, it is argued, this Court is ignoring the Congressional assumption that such agreements may not be enforced through economic pressure. This argument must be rejected. First, a close reading of the legislative history, particularly the Congressional consideration of *Denver Bldg. Trades,* indicates the only subject of Congressional action was union signatory agreements, economic pressure in support of which would *not* be approved by my reasoning or the Court's. *See* Conf.Rep., *supra* note 1, at 39; *Connell Construction Co. v. Local 100, Plumbers & Steamfitters,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) *citing Drivers, Salesmen, etc., Local 695, Teamsters v. NLRB,* 124 U.S.App.D.C. 93, 361 F.2d 547, 553 (1966). Second, we will not extend such a narrow Congressional balance of union and employer economic power beyond the specific subject which motivated Congressional action, when such extension will reduce the effectiveness of the strike weapon. *See* note 11 *supra.*

I make one *caveat* to the reasoning of this opinion. The case *sub judice* concerns union pressure on an allegedly third party employer proscribed by § (b)(4)(ii)(B), and not union pressure on other employees as proscribed by § 8(b)(4)(i), except to the extent the union here attempted to persuade its own members to

# 914

MacKINNON, Circuit Judge, with whom TAMM, ROBB and WILKEY, Circuit Judges, join (dissenting):

We review here a determination of the National Labor Relations Board that Enterprise Association engaged in an illegal secondary boycott as proscribed by section 8(b)(4)(B) when it sought to enforce its interpretation of a clause in its collective bargaining contract wherein the employer agreed that certain pipefitting operations would be performed at the jobsite. The majority opinion concerns itself almost entirely with the validity of the "right-to-control test" which it asserts the Board used as the sole test to judge the legality of the Union's action. I disagree with the majority's assessment as to the use of the test, which seems to me thoroughly compatible with the Supreme Court's *National Woodwork* decision,[1] but more fundamentally this opinion concludes that the majority has taken an unduly restrictive view of the scope of section 8(b)(4)(B).

## I. THE PROHIBITION AGAINST SECONDARY BOYCOTTS

The central issue in this appeal revolves around the secondary boycott provisions of the Labor-Management Relations Act. The statute prohibiting such boycotts was first enacted in 1947 as section 8(b)(4)(A) of the Taft-Hartley Act.

It was amended by the Landrum-Griffin Act in 1959 and at that time redesignated as section 8(b)(4)(B).[2] It is this portion of the statute that must be applied to the facts of this appeal, which comes to us following written opinions by an Administrative Law Judge (ALJ) and by a unanimous three-member panel of the National Labor Relations Board.[3]

### A. *Factual Background.*

The rendition of the following basic facts by the ALJ is not in dispute[4]:

Slant/Fin Corporation (hereafter Slant/Fin), manufacturer of the air-conditioning units, was a New York Corporation with its principal office and place of business in Greenvale, New York.

Austin, the general contractor and engineer for the Norwegian Home for the Aged, was an Ohio Corporation with its principal office and place of business in Roselle, New Jersey. Austin engaged in providing and performing engineering, general contracting and related services in various states of the United States, including New Jersey and New York.

Hudik-Ross Co., Inc. (hereafter Hudik), the heating and air-conditioning subcontractor, was a New York Corporation with its principal office and place of business in New York City. It engaged in providing heating, ventilation, air-con-

---

participate in the job action. I have not fully explored whether the reasoning applied to § 8(b)(4)(ii)(B) should apply exactly to § 8(b)(4)(i).

1. *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

2. Here follow the 1947 provisions with the 1959 amendments italicized. Provisions stricken in 1959 appear in brackets.

Sec. 8(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(4)(i) to engage in, or to induce or encourage [the employees of] any [employer] *individual employed by any person engaged in commerce or in an industry affecting commerce* to engage in, a strike or a [concerted] refusal in the course of [their] *his* employment to use, manufacture, process, transport, or otherwise handle or work on any

goods, articles, materials, or commodities or to perform any services; *or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce,* where *in either* case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any [employer or self-employed or other] person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . *Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing* . . . (61 Stat. 141, 73 Stat. 542).

3. 204 NLRB 760 (1973).

4. J.A. 234; *see also* J.A. 253.

ditioning and related services at various construction jobsites in New York state. The Enterprise Association, Local Union No. 638 (hereafter the Union, also the Steamfitters), affiliated with the International Plumbing and Pipefitters Union, AFL–CIO, operated in New York City and is a labor organization as defined by section 2(5) of the Labor-Management Relations Act.

Austin was designated general contractor and engineer for the construction of the Norwegian Home in New York City. In that capacity, Austin prepared the engineering job specifications, employed directly certain Union construction workers, and subcontracted the electrical, plumbing, heating, ventilation and air-conditioning work to various subcontractors.

The building specifications were dated November 29, 1971. With respect to the heating and air-conditioning units they provided:

> Furnish at the jobsite Slant/Fin Climate Command Air Conditioners. The unit shall be *complete* with cabinets, filters, cooling chasis, heating coil fans, main water flow and condensate assembly . . . .
>
> * * * * * *
>
> *The main flow and condensate assembly shall be factory installed as an integral part of the unit by the manufacturer* . . .
>
> * * * * * *
>
> Manufacturer shall furnish a written guarantee for a period of one year after completion of installation . . . .
>
> * * * * * *

(J.A. 233). (Emphasis added).

These specifications required the subcontractor (Hudik) to install air-conditioning units as manufactured by Slant/Fin *complete* with the factory installed "waterflow and condensate assembly," *i. e.*, with internal prepiped waterflow and condensate assemblies. With this prepip-

ing, the equipment would be guaranteed by the manufacturer for one year.

Hudik received the subcontract for the heating, ventilating and air-conditioning work as the result of competitive bidding and on January 14, 1972, entered into the subcontract with Austin to install the heating and air conditioning in the building according to the specifications. The Administrative Law Judge found that Hudik was aware of the above-quoted specifications prior to bidding.[5]

Hudik had been a union contractor in New York City for many years and its collective bargaining contract with the Union provided for compliance with the following rule:

### RULE IX

### CUTTING PIPE AND MAKING UP FITTINGS

* * * * * *

> Radiator branches, convector branches and coil connections shall be cut and threaded by hand on the job in accordance with Rule V.

* * * * * *

(J.A. 213). The Union contends that Rule IX required Hudik to assign to its members on the jobsite the work of cutting and threading certain "internal piping" in the air-conditioning units. But the building specifications with which Hudik was obligated to comply required the installation of the completed units as delivered by Slant/Fin with their internal piping for main waterflow and condensate assembly already assembled by the manufacturer. The subcontract called for the installation of 114 air-conditioning units at a total cost of $51,000 (J.A. 192).

On June 22, 1972, the air-conditioning units arrived at the jobsite and were unloaded. Hudik's job foreman contacted Daly, the Union's business agent, and the two men proceeded to inspect the units. The next day, Daly told *Austin's* project superintendent that members of

---

**5.** J.A. 234.

the steamfitters' union "would not install the Slant/Fin units because the *piping inside* the units was steamfitters' work and that Rule IX of their contract with Hudik called for them to do the inside piping work on site" (J.A. 235, emphasis added). Daly conveyed the same message to the Hudik superintendent and to Frank Hudik. Hudik pointed out to Daly that the units had been preassembled and pretested at the factory and that the building specifications called for installation of the complete Slant/Fin units.[6]

Nevertheless, because the internal piping had been done at the factory, the Union refused to install the Slant/Fin units, and as a consequence held up completion of the building. Austin filed an unfair labor practice charge against the Union alleging that it was engaged in an illegal secondary boycott prohibited by section 8(b)(4)(B). The Union had never met with Slant/Fin and there was no evidence that the Union had ever tried to organize Slant/Fin's employees.

There was testimony that on other jobs the Union had fitted pipe on similar American Standard air-conditioning units on the jobsite, but a witness for the pipefitters pointed out that those units did not have the bypass arrangement or condenser contained in the Slant/Fin equipment. (J.A. 151–155). The engineering sketch of the manufactured unit, see Figure 1 (J.A. 196, 224, 225), indicates that the work the local Union claimed included a number of integrated and necessary *internal* parts of the complete air-conditioning unit produced and guaranteed by Slant/Fin. The disputed work was substantially more than just cutting and threading the pipe to connect the air-conditioning units to the basic piping that ran throughout the building. It included connecting up two valves and a condenser (J.A. 196, 224, 225)—in other words, the Union sought to perform final assembly tasks on *internal parts* of the air-conditioning units. See Figure 1. To comply with

Figure 1. At the hearing before the ALJ, Robert Grand, District Superintendent for Austin, drew circles around internal piping at either end of a diagram of the Slant/Fin unit to indicate the location of the "main water flow and condensate assembly piping." (J.A. 78-79). Subsequent witnesses testified that this piping was guaranteed to the Union by Rule IX and was the source of the dispute between Enterprise and Hudik. (J.A. 122, 130, 167-69). Frank Hudik drew "x's" on the diagram at both ends of the unit to indicate the location of piping necessary for installation of the completed Slant/Fin assembly. (J.A. 123-24).

---

6. The complete units were factory prepiped, tested and guaranteed by Slant/Fin, the manufacturer. J.A. 233, 235.

the demand that the local Union perform that internal work would require the unit to be dismantled, the assembly surrounding the two valves and the condenser to be taken apart, and the local workmen to reconstruct the internal piping, fit new pipe to the valves and condenser, connect them and then reassemble the complete unit. Whether the manufacturer would be expected to furnish the valves and the condenser was not stated.

B. *The Decision of the Administrative Law Judge*

The finding critical to this appeal in the decision by the ALJ stated:

3. By inducing and encouraging individuals employed by Hudik to engage in a strike and in a refusal in the course of their employment to handle and work upon factory piped heating and cooling units manufactured by Slant/Fin, which Hudik was required by its contract with Austin to install in the Norwegian Home being constructed by Austin as engineer and general contractor, and by coercing and restraining Hudik, an object thereof being to force or require Hudik to cease using factory piped heating and cooling units and cease doing business with Austin and Slant/Fin, Respondent had engaged and is engaging in unfair labor practices within the meaning of Section 8(b)(4)(i) and (ii)(B) of the Act.[7]

(J.A. 243). In his opinion the ALJ analyzed the facts and set forth his reasoning in considerable detail,[8] and as re-

---

**7.** The decision of the ALJ stated another possible ground for decision: that he interpreted Rule IX to refer only to "pipe within Hudik's control and which could be cut on the job." The ALJ explicitly declined to rely on this conclusion in his ruling. J.A. 237. *See also* Rule IX at p. 4 *supra*, and for text of the decision of the ALJ on this point *see* text at p. 24 *infra*. Hudik raised the same point initially with the Union agent (Daly) when the issue first arose:

Q. Did you tell Mr. Daly that Rule 9 did not apply to this unit because of the nature of its construction?
A. (Hudik) Yes.
Q. Did you say that was so because the work had been pre-assembled in Slant/Fin's factory?
A. Yes.
Q. That was the reason why you told Mr. Daly that, because it had been pre-assembled in the Slant/Fin factory?
A. Pre-assembled and pretested.
Q. In the Slant/Fin factory?
A. Correct.
J.A. 167–68.

**8.** "In the instant situation, since Hudik is neither the manufacturer of prepiped units (Slant/Fin) nor is it the engineer and general contractor (Austin) who specified the use of particular prepiped units, it is apparent that the Union's dispute or problem is with Slant/Fin and Austin. Enforcing a union contract with Hudik to prevent Hudik's installing prepiped units that were neither manufactured nor specified by Hudik is simply a use of Hudik as an instrumentality or means of exerting

pressure against Slant/Fin and Austin. The Union's real problem and dispute is with the manufacturer of prepiped units and the engineer who specifies that such units are to be used. That Hudik is only a means or instrumentality for exerting pressure against Slant/Fin and Austin with whom the Union has its primary dispute, will appear if we consider two possible situations.

"Example A is where Hudik or similar union subcontractor is invited to bid on a job where prepiped units are to be installed. The Union reminds Hudik of the terms of the union contract requiring on the job piping. Hudik therefore does not bid and does not get the job, or if he does bid and obtains the subcontract, his union employees refuse to install the prepiped units. The construction site, however, in Example A, is in an area where the engineer and general contractor are then able and willing to secure a non-union subcontractor or a subcontractor employing members of a union who are not adverse to installing prepiped units. The job is therefore completed without Hudik and his employees. Assume that this pattern is repeated on other jobs in the area and with the same results. It is clear therefore that in Example A, the Union's problem and dispute is not with Hudik since Hudik, despite voluntary or involuntary compliance with the union contract, is an ineffective means or instrumentality 'under all the surrounding circumstances' for exerting pressure against the manufacturer of prepiped units or the engineer specifying their use. The Union's problem or dispute is with the last two mentioned parties, not with

quired by both the Supreme Court's decision in *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), and sound adjudicative practice, he considered "all the surrounding circumstances."[9]

## C. *The Board's Decision*

Both the Union and the General Counsel filed exceptions to the ALJ's decision with the Board. Upon review of these submissions, the Board decided

> to affirm the rulings, findings, and conclusions of the Administrative Law Judge to the extent consistent herewith, and to adopt his recommended Order.

(J.A. 252).

Although the Board essentially adopted the findings and reasoning of the ALJ, its opinion highlighted the facts that (1) the refusal to work was based on a "valid work preservation" contract with Hudik, (2) Hudik was incapable of

assigning the work because the questioned work was never Hudik's to assign in the first place, and (3) the Union had immediately and specifically informed Austin, the general contractor, who did not have a contract with or employ any members of the Union, that it would not permit Hudik to install the air-conditioning units. This latter fact indicates that Austin was an object of the Union's complaint from the very start. The Union knew that Austin as the general contractor was the only party with the power to comply with its demand. Thus, relying on the opinion of the ALJ and its own additional statement, the Board found that the Union was exerting prohibited secondary pressure on Hudik with the object either of forcing a change in Austin's manner of doing business or of forcing Hudik to terminate its subcontract with Austin. The Board concluded that the Union's exertion of pressure on Hudik contravened section 8(b)(4)(B) because it was undertaken for its effect on Austin and Slant/Fin.[10]

Hudik. Union enforcement of the Union-Hudik contract in Example A does not preserve work for the Union but serves to deprive Hudik and its employees of work. The Union does not exist as an organization whose purpose is to deprive its members of work. It is apparent that the Union's dispute is not with Hudik but that it is with the manufacturer and the party specifying prepiped units.

"Example B is of course the instant case. The sole difference between A and B is that in the instant case, B, Hudik is an effective means or instrumentality for exerting the economic pressure of the Union against Slant/Fin, the manufacturer, and Austin, the engineer. In Example A Hudik was an ineffective means or instrumentality against the manufacturer and the engineer. The reason for the difference between being an effective or ineffective instrumentality for pressure in the two examples is revealed by considering all the surrounding circumstances. In the instant case, the matter occurs in New York City, where the construction site is in an area where there are no nonunion steamfitters available or no nonunion mechanical contractors; or, if either of the nonunion categories exist, neither Austin, the union general contractor and engineer, nor Hudik, the union subcontractor could or would see them. That is the reason why the union steamfitters, employees of Hudik, by refusing to install Slant/Fin [units] specified by Austin, are able to use Hudik as an effective

means or instrumentality for exerting pressure against Slant/Fin and Austin. The true 'culprits' and the parties with whom the Union has its dispute are Slant/Fin, who manufactures prepiped units, and Austin, who specified such units as the heating and cooling units for installation in the Norwegian Home. If prepaid units cannot be installed in the large commercial, public, and industrial buildings in the New York area or in other areas effectively organized by the Union and other building trades union, the manufacture[r] will be materially affected and Austin and other engineers and general contractors will not specify their purchase and use in buildings.

"But the fact that in Example A, above, Hudik would be an ineffective means of pressure by the Union against Slant/Fin and Austin, and, in Example B, the instant case, Hudik is an effective means of pressure in view of all the surrounding circumstances, does not alter the fact that in both situations, Hudik is a means or instrumentality and that the Union's primary dispute is with Slant/Fin and Austin."
[Footnotes omitted.]
J.A. 238–40.

**9.** 386 U.S. at 644, 87 S.Ct. 1250. *See generally* Part II of this opinion.

**10.** The Board's opinion stated, *inter alia:*
> We agree with the Administrative Law Judge that the Respondent thereby violated

### D. *The* National Woodwork *Precedent*

It is apparent that the literal provisions of the secondary boycott statute were violated: the Union did as "a labor organization . . . induce [and] encourage . . . individual[s] employed by any person engaged . . . in an industry affecting commerce to engage in, a strike [and] . . . refusal in the course of [their] employment to use . . . *or otherwise handle or work on* . . . goods, articles . . where . . . an object thereof . . . [was]—(B) forcing . . . [and] requiring . . . [a] person to cease *using* . . . handling . . or otherwise dealing in the products of any other producer . . . ." 29 U.S.C. § 158(b)(4)(B). Translating the statute to the facts of this case:

> The Union induced and encouraged its steamfitters employed by Hudik to strike and refuse to use, handle and

> Section 8(b)(4)(i) and (ii)(B) of the Act. We note that the refusal of the Respondent to let Hudik's employees install the climate control units was based on a valid work preservation clause in the agreement with Hudik, the subcontractor, and was for the purpose of preserving work they had traditionally performed. However, Hudik was incapable of assigning its employees this work; such work was never Hudik's to assign in the first place. Moreover, we note that the Respondent informed Austin, who did not employ employees represented by the Respondent and had no agreement with that Union, that it would not let Hudik install the climate control units involved. Considered together, these facts clearly indicate that the Respondent was exerting prohibited pressure on Hudik with an object of either forcing a change in Austin's manner of doing business or forcing Hudik to terminate its subcontract with Austin. Since the pressure exerted by the Respondent on Hudik was undertaken for its effect on other neutral employers, this pressure was secondary and prohibited by Section 8(b)(4)(B).
>
> Accordingly, we find that by its conduct the Respondent violated Section 8(b)(4)(i) and (ii)(B) of the Act. [Footnote omitted].
> J.A. 254. In a footnote the Board further stated:
>
> > In view of our finding that Respondent's actions were undertaken for a secondary objective, we find it unnecessary to pass upon the Administrative Law Judge's finding that

work on air-conditioning units with internal prepiping where an object of their strike and refusal was forcing and requiring Hudik to cease using the products of Slant/Fin and to cause Austin to cease doing business with Slant/Fin.

We are told by *National Woodwork,* however, that it is not sufficient to find a violation of the "the letter of the statute" and that in determining whether certain action is "within the intention of the makers [of the statute]," we should interpret the Act according to "its spirit." [11] 386 U.S. at 619, 87 S.Ct. 1250. This is always a sound rule of statutory interpretation, but it does not permit wholesale deviation from the provisions of the statute. In any case involving the interpretation of a legislative act the provisions of the statute itself are of primary importance, and the fact that certain conduct is within the literal language of the Act is a weighty and often

> Austin and Slant/Fin were the primary employers. Hence, we are not deciding herein whether picketing or other actions brought to bear directly against Austin and Slant/Fin would constitute lawful primary activity.
> J.A. 254.

11. The spirit of the Act is to be found in a combination of (1) the statutory language, (2) the committee proceedings and reports, and (3) the congressional debates. There is no question about the statutory language—it clearly prohibits product boycotts directed to interference in handling or working on articles such as we have here, where the Union seeks to accomplish its objective through secondary pressures. As for the congressional proceedings, *National Woodwork* notes, 386 U.S. at 624, 87 S.Ct. at 1257, and nn. 12, 13, that Senator Taft and others "frequently [stated] . . . that § 8(b)(4)(A) was designed to eliminate the 'secondary boycott.'" The Senate Committee Report reiterated this intent. S. Rep. No. 105, 80th Cong., 1st Sess. 22, 1 Legislative History of the Labor Management Relations Act, 1947 (hereafter 1947 Leg.Hist.), 428; 386 U.S. at 625, 87 S.Ct. 1250. A strong indication that Congress intended the prohibition against secondary boycotts to be *strictly applied* also is reflected in the extract from the Supplementary Analysis of the bill inserted into the Congressional Record by Senator Taft on June 12, 1947, following the adoption on June 6th of the Conference Report. *See* note 81 *infra.*

controlling factor in its interpretation. When we try to overcome the literal applicability of section 8(b)(4) to the facts of this case we have a pretty riddle.

To solve it we start with a factual situation which presents a secondary boycott as proscribed by the literal language of the Act. The question then arises whether the spirit of that law is violated by the acts of the Union in this instance.

The majority points to *National Woodwork* for the principle that "[t]he touchstone is whether the agreement *or its maintenance* is addressed to the labor relations of the contracting employer vis-a-vis his own employees." 386 U.S. at 644–45, 87 S.Ct. at 1268 (emphasis added). In that case both "the agreement" and "its maintenance" were addressed to the immediate contracting employer. However, while the written agreement here may have been addressed to the contracting employer (Hudik), at least in part, the Union addressed the boycott endeavoring to *maintain* the agreement to employers elsewhere, *i. e.,* to Austin and Slant/Fin. As I read *National Woodwork* it is not sufficient that the agreement have a primary focus, if its enforcement is attempted by secondary pressures.

Judge Wright's opinion seeks its principal support in the decision in *National Woodwork,* but the Supreme Court noted that that case involved a *primary* boycott, a fact which clearly distinguishes it from this case. There the general contractor had agreed with the local carpenters' union that carpenters he employed would not handle premachined doors. This building contract gave him *discretion* to use premachined *or* blank doors, yet he ordered premachined doors from the National Woodwork Manufacturers Association. He was promptly struck by his union carpenters. On these facts the Supreme Court, in the case which resulted from the petition of the Association, held that when employees strike their immediate employer to secure compliance with demands for legitimate work

preservation, the boycott is primary and thus not prohibited by section 8(b)(4)(B).

While the opinion in *National Woodwork* recognizes that the object of the strike was the preservation of traditional work it does not hold that all attempts to preserve traditional work by striking one's immediate employer constitute permissible primary boycotts. In fact, the opinion states exactly the contrary:

> In effect Congress, in enacting § 8(b)(4)(A) [now § 8(b)(4)(B)] of the Act, returned to the regime of *Duplex Printing Press Co.* and *Bedford Cut Stone Co., supra,* and barred as a secondary boycott union activity directed against a neutral employer, *including the immediate employer* [emphasis added] when in fact the activity directed against him was carried on for its effect elsewhere.

386 U.S. at 632, 87 S.Ct. at 1262. That is the situation we confront here. Hudik is essentially neutral in this dispute because it does not have and never did have the power to comply with the Steamfitters' demands. Thus the pressure created by the Hudik employees' boycott of the Slant/Fin units must have been directed at Austin and Slant/Fin as they were the only parties with the power to satisfy the demand that the work be taken from Slant/Fin employees and reassigned to the Union. We should not assume an absurdity and conclude that the Union would expect its demands to be met by an employer who did not possess the power to do so. The logical deduction that Austin and Slant/Fin are the objects of the Union's action is as sound a basis for invoking the prohibition of section 8(b)(4) as would be specific proof that the Union was motivated by disapproval of the labor policies of those parties. The *National Woodwork* Court noted that "[t]here need not be an actual dispute with the boycotted employer [here Austin and Slant/Fin] . . . for the activity to fall within this category [boycotts 'tactically calculated to satisfy union objectives elsewhere'], so long as the tactical object of the agreement and its maintenance is that em-

ployer . . . thus making the . . boycott secondary in its aim." 386 U.S. at 645, 87 S.Ct. at 1268.

### E. Traditional Work

The Union contends, and Judge Wright's opinion concludes, that the strike against Hudik is primary because the strikers are employed by Hudik, because they are striking Hudik, and because they claim that their sole objective is to enforce Hudik's agreement to assign them their traditional work. Because they are striking their immediate employer to enforce a provision of their contract with him, this argument has a surface plausibility. But this superficial analysis of obvious facts does not necessarily lead to the conclusion that the Union's refusal to work on the Slant/Fin air-conditioning units was a primary boycott of Hudik.

As Representative Griffin pointed out during the debate on the Landrum-Griffin Bill, "[w]e must look to the purpose of the picketing in the particular situation."[12] The Kennedy-Thompson analysis of the Landrum-Griffin Bill also identifies the basic flaw in the above reasoning of the majority. It clearly points out the distinction between permitted primary and illegal secondary activity where employees are striking their own employer over wages, i. e.: "[When the picket line at the employees' job site] . . . aims at halting commercial intercourse with [their own employer, it is] (a primary boycott) [but when the aim is] at halting intercourse with persons who have intercourse with him [it is] (a secondary boycott)."[13]

The Union is seeking what it asserts is *work preservation*, but the means it has chosen toward that end—a strike against an employer who never had the disputed work to assign—constitutes secondary pressure. The boycott's purpose is served primarily by the pressure the Union brings to bear on Austin and Slant/Fin through its strike against Hudik. It is the force and direction of this pressure that determines whether the boycott is primary or secondary. The only parties who could be said to have taken the work away from the local union are Slant/Fin, who manufactured the units complete with internal piping, and Austin, who specified the installation of such completed units. The strike insofar as it is against Hudik is not to achieve work *preservation* because the strike could not *preserve* work that Hudik never possessed and never had the power to assign.[14]

What the Union is attempting to do by its strike is to compel Hudik to acquire work its members can perform, and this goal is to be accomplished by the secondary pressure that the strike against Hudik brings to bear upon Austin and Slant/Fin: specifically, Hudik can no longer install air-conditioning units necessary for the completion of the building according to contract specifications. Unlike the strike in *National Woodwork*, this action is not a primary boycott against an immediate employer seeking to compel him to exercise discre-

---

**12.** II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (hereafter 1959 Leg.Hist.), 1615.

**13.** *Id.* at 1707.

**14.** A panel of this court composed of Judges Bastian, Burger (now Chief Justice), and Wright held it was a violation of section 8(b)(4)(B) for a union to strike its immediate employer in an attempt to enforce a provision of its collective bargaining agreement which prohibited the employer from contracting for work where plumbing was "withheld from the plumbing contract by either the owner or general contractor for the purpose of being installed by other than journeymen plumbers. . . ."

In that case the union contractor (a plumbing subcontractor) had contracted for the inside plumbing and another contractor who employed members of the Laborers' Union had received the contract for the outside utilities. The collective bargaining provision in that case is even clearer and more direct than the work preservation clause here, but nevertheless there was no dispute that the union strike to enforce its provision violated section 8(b)(4)(B). Local 5, Plumbers & Pipefitters v. NLRB, 116 U.S.App.D.C. 100, 321 F.2d 366, *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).

tion over work assignments committed to him by the general contract in a manner compatible with the operative terms of a collective bargaining agreement; instead, this is a secondary boycott against the Union's immediate employer (Hudik) seeking by the pressure such a strike brings to bear on third parties (Austin and Slant/Fin) to cause the immediate employer to *acquire* certain traditional work so he can assign it to his employees.

The determination whether a boycott is secondary involves consideration not only of the objective of the strike in terms of working conditions, but also of the *means* sought to achieve that objective. As the *National Woodwork* Court noted, the "central theme" of section 8(b)(4)(B) is "the protection of neutrals against secondary pressure." 386 U.S. at 627, 87 S.Ct. at 1259. Thus the statute does not tolerate boycotts involving secondary pressures conducted to preserve traditional work,[15] nor is there anything in its legislative history to support that conclusion. The object, spirit and language of the statute all coalesce in a conclusion that traditional work can be preserved only by a primary boycott and that it is unlawful to use secondary pressure to achieve an otherwise legitimate purpose. Here the pressure on Hudik was secondary and hence the strike against Hudik is proscribed by the letter and spirit of § 8(b)(4)(B).

### F. The Secondary Boycott Conducted by Local No. 3 in New York City

The majority opinion in *National Woodwork* sought to identify "Congress' purpose in enacting" section 8(e), a provision closely related to and enacted at the same time as section 8(b)(4)(B). The Court indicated that the answer was to be found "from an examination of the history of congressional action on the subject." 386 U.S. at 620, 87 S.Ct. at 1255. The opinion proceeded to set out and discuss the extensive statutory history of certain applicable labor legislation. 386 U.S. at 620–24, 87 S.Ct. 1250. Next to the language of the statute itself, no better indicia of congressional intent can be found than that provided by a close examination of the complete legislative history of the section.

This legislative history begins with the enactment in 1947 of section 8(b)(4)(A),[16] which was part of the Taft-Hartley Act. That Act was drafted and enacted by the 80th Congress over the President's veto following very extensive labor hearings in both the House and Senate. In the course of those hearings there were many references to secondary boycotts.[17] In the House of Representatives, where the legislation originated, the Hartley Bill, H.R. 3020, brought secondary boycotts within its definition of "illegal boycott" (Sec. 2(14)).[18] An illegal boycott

---

**15.** In *Local 5, supra,* this court stated:

The Board correctly counters with the argument that *Sand Door*[5] disposes of this suggestion. That case teaches us that regardless of the legitimacy of the end sought by the union, it cannot engage in secondary pressure to obtain it. We find nothing in this case which distinguishes it from that rule. Admittedly, clause 32 is not identical to the "hot cargo" provision in *Sand Door* but that case is not limited to "hot cargo" clauses.

[5] *Local 1976, United Brotherhood of Carpenters' etc., Union v. N. L. R. B.,* 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958); see also *N. L. R. B. v. Bangor Building Trades Council,* 278 F.2d 287 (1st Cir., 1960).

*Id.* 116 U.S.App.D.C. at 104, 321 F.2d at 370.

**16.** *See* note 2 *supra.*

**17.** *See National Woodwork,* 386 U.S. at 633 n.21, 87 S.Ct. 1250; *see also* I 1947 Leg.Hist. xliv.

**18.** The term "illegal boycott" means a concerted refusal, or threat of concerted refusal, by individuals in the course of their employment—

(A) to render services, where an object of the refusal or threat is to force a person to do business or to cease doing business with another person; or

(B) to render services, where an object of the refusal or threat is to force a person to deal with or to cease dealing with a labor organization as the representative of individuals other than themselves; or

(C) to use, install, handle, transport, or otherwise deal with particular articles, materials, or commodities by reason of the origin

was within those "unlawful concerted activities" (Sec. 12(a)(3))[19] for which the union and its members were made subject to a suit for damages and to deprivation of their rights under the Act to the same extent as a person found to have engaged in an unfair labor practice (Sec. 12(b) and (d)).[20]

In the Senate the subject matter of section 2(14)(A) and (C) of H.R. 3020, provisions dealing with "illegal boycotts," was placed in section 8(b)(4)(A), which tracked closely the language of the House bill. In the Senate the section assumed its present basic character as a prohibition against an unfair labor practice.[21] But it was the House bill which first attached union demands upon employers to "cease doing business" with others and refusals "to use, install [or] handle particular articles." The House Committee Report made it clear that in addition to employer-union activities the bill was also aimed at removing "direct restraints of trade."

> Illegal boycotts take many forms. Often they are to compel employers to force their employees into unions or to give a union control over them as their bargaining agent in violation of the Labor Act itself. *Sometimes they are direct restraints of trade, designed to compel people against whom they are engaged in to place their business with some other than those they are dealing with at the time, or vice versa.* The effects of boycotts upon business, and particularly upon small commercial enterprises in metropolitan centers, such as New York, Philadelphia, and Pittsburgh, have often been disastrous.[22]

The sentence in italics identifies an objective of the boycott we are dealing with here.

The House accepted the statutory framework adopted by the Senate and the Senate's redraft of section 8(b)(4)(A)[23]; therefore the Senate Report[24] is informative (although not to the exclusion of the House Report) as to the congressional intent of the provision finally enacted.

The statements on the floor of Congress and the committee reports all make some contribution toward clarifying the legislative intent, but no single item of legislative history is any more important to the problem posed by this appeal than the following quotation with respect to section 8(b)(4)(A) from the Senate Report in 1947 on the Senate bill:

> This paragraph [§ 8(b)(4)(A)] also makes it an unfair labor practice for a union to engage in the type of secondary boycott that has been conducted in New York City by local No. 3 of the IBEW, whereby electricians have *refused to install* electrical products of manufacturers employing electricians who are members of some labor organization other than local No. 3. (See testimony of R. S. Edwards, vol. 1, p. 176 et seq.; *Allen Bradley Co. v. Local Union No. 3, I. B. E. W.,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.)

S. Rep. No. 105 on S. 1126, 80th Cong., 1st Sess. 22, 1 Leg.Hist. 428 (emphasis added). While the secondary boycott conducted by Local No. 3 in New York City encompassed manufacturing, distribution, installation and repair, it is significant that the Senate Report on the bill chose to mention only the installa-

---

19. *Id.* at 205.

20. *Id.* at 168, 205.

21. *Id.* at 239–40. *Cf.* note 2 *supra.*

22. I 1947 Leg.Hist. 315 (emphasis added).

23. *Id.* at 548.

24. *Id.* at 407–504, see especially p. 428. The "cease doing business with another person" and the "refusal . . . to install [or] handle" provisions were incorporated into the Senate bill almost *in haec verba. Id.* at 7.

---

or proposed destination thereof, or by reason of the character of a prior or proposed future handling thereof, or by reason of the policies or practices of any person (not their employer) having any direct or indirect relationship thereto.

I 1947 Leg.Hist. 168–69. That the House intended the bill to cover boycotts extending beyond work assignment claims was evident since the bill dealt with such problems as "jurisdictional strikes," which were also prohibited. *Id.* at 169, 205.

tion aspect. The *National Woodwork* opinion refers to the passage above, but because it quotes only the first sentence the decision does not reveal the very clear intent that Congress indicated by its specific reference to the particular testimony of R. S. Edwards before the Senate committee on Local No. 3's secondary boycott.[25] 386 U.S. at 619–20, 87 S.Ct. 1250. The Committee Report also cited the decision in *Allen Bradley Co. v. Local 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), where the Supreme Court considered the secondary boycott activities of Local No. 3. Neither the reference to Edwards' testimony nor that to *Allen Bradley* indicates that Congress intended section 8(b)(4)(B) to be given so narrow a construction as to exclude the secondary boycott that exists here. Let us then examine the Edwards and *Allen Bradley* references as an aid in ascertaining congressional intent.

### G. *Edwards' Senate Testimony and the Conspiracy in Allen Bradley*

The secondary boycott conducted in New York City by Local No. 3, IBEW is best described in Edwards' testimony[26] rather than in the opinion in *Allen Bradley,*[27] since Edwards' testimony was directed to the labor law aspects of Local No. 3's activities, while the opinion in *Allen Bradley* related primarily to antitrust issues. In fact the Supreme Court decided that under the law as it existed prior to outlawing secondary boycotts, the union's conduct would have been valid if it had acted alone and not conspired with employers. Edwards testified that Local No. 3 was involved in a monopoly in New York City of the "complete manufacture, distribution, installation and maintenance of all electrical-construction

materials."[28] Local No. 3 was for all practical purposes the only electrical "installation" union in New York City.[29] It was the *installation* restrictions as enforced by the conspiracy, prohibiting local electricians in New York City from doing any work on electrical fixtures and other electrical materials *after* their manufacture, to which the product boycott prohibitions of section 8(b)(4)(A) of the Labor Act were particularly directed. The Department of Labor had received a number of complaints that Local No. 3 was "declining to install electrical equipment unless it bears the label of that organization [*i. e.,* Local No. 3]."[30] "Even materials manufactured by other IBEW locals outside the Greater New York district are black listed."[31] Prior to passage of section 8(b)(4)(A) the boycott imposed by Local No. 3 was successful in requiring that electrical fixtures or installations manufactured elsewhere be "dismantled and the wire taken out of them, and then" rewired on the job by the local union before they could be installed in New York City.[32]

Thus, in its essential features, and particularly as it related to *installation abuses,* the boycott by Electricians Local No. 3 in New York City described in Edwards' testimony was very close to that which the Steamfitters' Union here brought against Hudik. Both unions refused to install manufactured articles to protect the on-site job work of their union members, and the only way their demands could be met was to allow the manufactured articles to be dismantled on site and permit the members of the local union to redo the work already done by the manufacturer, and for the future, for the employer having charge of the installation to cease doing busi-

---

25. The Edwards testimony was selected from over 2400 pages of Senate hearings.

26. 1 Senate Hearings on S. 55 and S.J.Res. 22, 80th Cong., 1st Sess. 176–204 (1947).

27. *But see* Justice Roberts' concurring opinion. 325 U.S. at 813–20, 65 S.Ct. 1533.

28. *See* note 16 *supra.* This testimony was corroborated by the decision in *Allen Bradley,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

29. 1 Senate Hearings on S. 55; S.J.Res. 22, 80th Cong., 1st Sess. 181 (1947).

30. *Id.* at 187.

31. *Id.* at 183.

32. *Id.* at 188.

ness with the manufacturer unless it changed its manufactured articles to permit on-site workers to do some of the final assembly work. The result in the case of Local No. 3 would be the delivery to the installers of incomplete fixtures without internal wiring (or dismantling and rewiring) and with Local No. 638 (the Steamfitters) it would be the delivery of incomplete air-conditioning units without internal piping (or dismantling and repiping).

The Senate Report clearly indicated that the "will not handle or work on" provisions of section 8(b)(4)(A) were aimed at precisely the type of secondary boycott that exists here.[33] And since, as *National Woodwork* states, "the basic thrust of [section 8(b)(4)(A)] was not expanded by the Landrum-Griffin [1959] amendments," [34] the same interpretation is to be given to the present section 8(b)(4)(B). The addition in 1959 of the specific proviso protecting primary boycotts that were not "otherwise unlawful" [35] did not change the intent of the section. What the proviso did was merely make explicit that which was previously implicit. The statement that Congress intended to make secondary boycotts illegal [36] clearly implies that primary boycotts are legal.

## H. The Majority Opinion and Right to Control

Faced with the fact that the letter of the statute is clearly violated and that the ALJ and the NLRB after considering all the surrounding circumstances found a secondary boycott in violation of the Act, the majority opinion launches into an attack on the so-called right-to-control test, which it asserts the Board used as the *sole* basis for its decision. In this respect the majority opinion is in error. The ALJ clearly considered all the "surrounding circumstances" [37] and the Board affirmed his "rulings, findings and conclusions" (J.A. 252) insofar as they were consistent with its decision and adopted his recommended Order. Since the opinion of the ALJ was consistent in almost every respect with the Board's decision, the Board indicated that it relied on all the surrounding circumstances of the boycott to the same extent as the ALJ. Thus the basic attack of the majority opinion, the claim that the Board based its decision only on the right-to-control test and failed to take into consideration all the surrounding circumstances, has no foundation in fact.

Moreover, after devoting most of its opinion to an attack on the concept of

---

**33.** S. Rep. No. 105, 80th Cong., 1st Sess. 22, I 1947 Leg.Hist. 428.

**34.** 386 U.S. at 623–24, 87 S.Ct. at 1257.

**35.** It is settled law that the National Labor Relations Act does not require any employee to cross a primary picket line and that pickets may request him not to cross the picket line (*NLRB v. International Rice Milling Company* [341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277]). The language of the "hot cargo" ban in S. 1555—which your committee adopted—did not impinge in any way on existing law concerning the crossing, or not crossing, of primary picket lines by employees. However, in order to set at rest false apprehensions on this score, the committee appended the disclaimer proviso which appears in section 705(a)(2) of the bill.
H. Rep. No. 741, 86th Cong., 1st Sess. 80, I 1959 Leg.Hist. 838, U.S.Code Cong. & Admin. News 1959, p. 2479.

The purpose of this provision is to make it clear that the changes in section 8(b)(4) do not overrule or qualify the present rules of law permitting picketing at the site of a primary labor dispute. This provision does not eliminate, restrict, or modify the limitations of picketing at the site of a primary labor dispute that are in existing law. See, for example, *NLRB v. Denver Building and Construction Trades Council, et al.* (341 U.S. 675 [71 S.Ct. 943, 95 L.Ed. 1284] (1951)); *Brotherhood of Painters, Decorators, and Paper Hangers, etc.,* and *Pittsburgh Plate Glass Co.,* (110 NLRB 455 (1954)); *Moore Drydock Co.* (81 NLRB 1108); *Washington Coca Cola Bottling Works, Inc.* (107 NLRB 299 (1953)).
H.Conf.Rep. No. 1147, 86th Cong., 1st Sess. 38, I 1959 Leg.Hist. 942, U.S.Code Cong. & Admin.News 1959, p. 2510.

**36.** I 1947 Leg.Hist. 428.

**37.** *See especially* note 6 *supra.*

right-to-control as a complete test to determine whether a boycott is primary or secondary, the majority in its closing paragraph finally comes to reality and admits that control over disputed work does have a vital place in determining the essential issues:

> However, in remanding in *Local 742*,[38] *supra,* and *Local 636*,[39] *supra,* we held that legal control in the struck employer over assignment of the work which a union professes a desire to preserve, while not alone dispositive, *may be considered by the Board along with other factors* [emphasis added] suggested by the *National Woodwork* Court in determining the union's actual objective.

Majority Op., 172 U.S.App.D.C. at ———— ——, 521 F.2d at 904–905. That is precisely the manner in which the ALJ and the Board did weigh and evaluate the demand of the Union and Hudik's inability to meet the work assignment demands of the Union.

It must also be noted that since right-to-control is recognized as a part of the test to be applied in such cases, instances may well arise where the outcome of its application will prove to be the *decisive* factor. In passing the original secondary boycott restriction, the House of Representatives forecast the use of a right-to-control test when it indicated that it intended to proscribe those boycotts where "the employers are powerless to comply with the demands giving rise to the [boycotting] activities . . . ." H.R.Rep. No. 245, 80th Cong., 1st Sess. 23 (1947), I 1947 Leg. Hist. 314.

This comment recognizes the force and validity of a right-to-control test and the unfairness of permitting a strike against an employer who lacks the right to control the decision. Even where right-to-control is not decisive, in almost any case it will be a factor entitled to very substantial weight because it measures the ability of the employer to comply with the union demands. Law and logic compel the conclusion that the ability or inability of two individuals to comply with a demand is a very material factor in determining whether one or the other is the true object of the demand.

## II. THE RIGHT–TO–CONTROL TEST

By 1967 seven Circuit Courts of Appeals had reviewed the right-to-control test: each circuit had validated the test without dissent.[40] In that year the Supreme Court in *National Woodwork* articulated the standards by which primary and secondary activity should be distinguished. The Court upheld the Board's determination that the particular work preservation clause at issue was not violative of section 8(e) of the Act[41] and

---

**38.** *Local 742, Carpenters v. NLRB,* 144 U.S. App.D.C. 20, 444 F.2d 895, *cert. denied,* 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971).

**39.** *Local 636, Plumbers & Pipefitters v. NLRB,* 139 U.S.App.D.C. 165, 430 F.2d 906 (1970).

**40.** *See Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 103, 321 F.2d 366, 369, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963); *Local 636, Plumbers & Pipefitters v. NLRB,* 108 U.S.App.D.C. 24, 30, 278 F.2d 858, 864 (1960); *NLRB v. Enterprise Association, Local 638, Plumbers & Pipefitters,* 285 F.2d 642, 645 (2d Cir. 1960); *NLRB v. Local 1694, Longshoremen,* 331 F.2d 712, 716–17 (3d Cir. 1964), *aff'g* 137 NLRB 1178; *Ohio Valley Carpenters District Council v. NLRB,* 339 F.2d 142, 145 (6th Cir. 1964); *American Boiler Mfrs. Ass'n v. NLRB,* 366 F.2d 815, 882 (8th Cir. 1966).

**41.** 29 U.S.C. § 158(e) (1970) provides:

> (e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . ..

that enforcement of the provision against a primary employer did not contravene section 8(b)(4)(B), but specifically withheld judgment on the propriety of the right-to-control test upon which the Board's conclusions in that case were founded.[42] Yet several circuits thereafter reversed their prior decision sanctioning the test, based upon language in *National Woodwork* which supposedly disapproved exclusive use of the test by the Board.[43]

On two occasions this court has announced similar decisions.[44] The majority now insists once more that the theoretical underpinnings of the right-to-control test were completely destroyed by *National Woodwork*. I am more inclined to accept at face value the Court's statement that the test was not under consideration in that case. I thus dispute the basic premises of the majority's opinion, and conclude that the reasoning of *National Woodwork* is compatible with the use of the right-to-control test to the extent that it was used in this case.

### A. *The Surrounding Circumstances*

The majority admonishes the Board to scrutinize the "realities" of the Union's dispute with Hudick-Ross, and insists that the single-minded right-to-control formula is devoid of practicality as well as theoretically bankrupt. A closer look at the findings and conclusions of the Administrative Law Judge (ALJ) which

the Board adopted[45] reveals that the test, as it was applied to the facts of this controversy, furnished a distinctively realistic basis for interpreting the relative positions of Enterprise and Hudik-Ross and a thoroughly practical determination of the objects of the Union's economic action.

### 1. *The Contractual Framework*

The ALJ determined that Austin was both general contractor and engineer for construction of the Norwegian Home for the Aged. Significantly, "Austin prepared the engineering job specifications for the Norwegian Home."[46] By the time Austin subcontracted the heating, ventilating and air-conditioning work on the project to Hudik-Ross, it had contracted for the purchase of prepiped Slant/Fin climate control units.

In his conclusions of fact, the ALJ advanced an interpretation of the work preservation agreement between Hudik and Enterprise.

> [I]n my opinion, the instant contract between Hudik and the Union, in providing that pipe would be cut and threaded on the job, necessarily implied that it referred to pipe within Hudik's control and which could be cut on the job. Neither Hudik nor the Union in their contract could prescribe nor were they prescribing the treatment of pipe that was within or had

---

**42.** 386 U.S. at 616 n.3, 87 S.Ct. 1250.

**43.** *See NLRB v. Local 164 IBEW*, 338 F.2d 105, 107–10 (3d Cir. 1968); *American Boiler Mfrs. Ass'n v. NLRB*, 404 F.2d 556, 561 (8th Cir. 1968); *Western Monolithics Concrete Prods., Inc. v. NLRB*, 446 F.2d 522, 526 (9th Cir. 1971); *Beacon Castle Square Bldg. Corp. v. NLRB*, 406 F.2d 188, 192 n.10 (1st Cir. 1969) (dictum). *Contra, George Koch Sons, Inc. v. NLRB*, 490 F.2d 323 (4th Cir. 1973); *cf. Associated General Contractors of California v. NLRB*, 514 F.2d 433 (9th Cir., filed Mar. 28, 1975).

**44.** *Local 742, Carpenters v. NLRB*, 144 U.S.App.D.C. 20, 444 F.2d 895, *cert. denied*, 404 U.S. 986, 92 S.Ct. 447, 30 L.Ed.2d 371 (1971); *Local 636, Plumbers & Pipefitters v. NLRB*, 139 U.S.App.D.C. 165, 430 F.2d 906 (1970). My concurrence in those decisions was based

on the use of the right-to-control test as an *exclusive* and *per se* standard.

**45.** *See* text, 172 U.S.App.D.C. at ——–——, 521 F.2d at 890–892 and note 8 *supra*.

**46.** J.A. 233. These facts parallel the situation in *National Woodwork*. There Frouge, the general contractor for the Naval Capehart Housing Project, exercised dominion over relevant specifications. The significant difference between the cases is evidenced in the ALJ's conclusion that:

> The Government's specifications for this job with reference to the type of doors required set forth the standards to be followed. However, neither the specifications nor Frouge's contract with the Navy required the doors to be precut or prefitted or premachined.

149 NLRB 646, 652.

been within the control of some other party . . . .[47]

The ALJ buttressed his interpretation of the work preservation agreement with a practical analysis of the benefit the Union hoped to derive from the provision.

> [W]e might presume that the Union would have been happy and content if Hudik had never sought or received the Norwegian Home contract or if Hudik would breach his subcontract as soon as the Union reminded Hudik of Rule IX of the Union contract. But, if Hudik, an employer of union steamfitters, does not bid on jobs and does not secure subcontracts, how does such a situation preserve or increase work for Hudik's union steamfitters . . . .[48]

Implicit in this observation is a reality to which the majority gives lip service but which it fails to apprehend: Hudik could not decline to bid on projects with prefabrication specifications and continue to be a competitive subcontractor.

Regardless of the validity of the ALJ's construction of Rule IX of the collective bargaining agreement, his tacit observation that trade unions' work preservation agreements almost inevitably conflict with contractual design specifications evinces a practical understanding of the true nature of the dispute between Hudik and Enterprise. Underlying his decision is the determination that the fundamental responsibility for prefabrication specifications in the construction industry falls on architects, engineers, and general contractors, and that boycotts by craft unions against subcontractors necessarily have as a primary object the application of pressure to those third

parties who actually require the use of factory-prepared products.[49] A recital of the surrounding circumstances that the ALJ examined to arrive at this conclusion demonstrates that he was concerned less with the locus of legal or contractual hegemony over disputed work than with the source of practical or effective control over prefabrication specifications.

### 2. The Labor Situation in New York

In analyzing the dispute between Enterprise and Hudik, the ALJ gave particular emphasis to three distinct points. First, Austin, in its capacity as "engineer and general contractor for the entire job, had made an engineering and business judgment that the Slant/Fin units were to be used on the project . . . ."[50] The ALJ noted Austin's awareness that "these units were factory prepiped, tested, and guaranteed by the manufacturer,"[51] apparently to suggest the factors that prompted the use of prefabricated climate control units. In discussing analogous contractual predicaments, both hypothetical and real, he pointedly identified the parties who controlled the specification of prefabricated products: in each case, an architect, engineer, or general contractor. His drift was unmistakable: pressure for the modification of prefabrication policies must focus on these principals or on the manufacturers of prefabricated goods.

Second, the ALJ identified the means by which pressure could be brought to bear on these responsible parties. He drew a distinction between "effective" and "ineffective" "means or instrumentalit[ies] . . . for exerting pressure against the manufacturer of prepiped

---

47. J.A. 237. The ALJ carefully contrasted this situation with the one which obtained in *National Woodwork,* noting (1) that Frouge "had the choice of using non-premachined or premachined doors, and chose the latter," and (2) that the union in *National Woodwork* insisted it would not handle premachined doors. In pointing out that the latter distinction, though "real," was not a "major basis" of his decision, the ALJ signalled that the former distinction was in fact significant.

48. J.A. 240.

49. *See generally id.* at 237, 238.

50. *Id.* at 236.

51. *Id.*

units or the engineer specifying their use."[52] In a thoroughly unionized setting, subcontractors could influence project specifications by declining to bid on projects which denied their employees the right to perform traditional unit work. The threat or enforcement of a boycott by those employees or unions representing them would deter subcontractors from bidding on projects with such specifications, and thus similarly discourage the use of prefabricated goods. But in a nonunionized area subcontractors would clearly be ineffective instrumentalities for exerting these pressures: the sole consequence of their actions would be the hiring of nonunion labor to install prepiped units. In obei-

sance to *National Woodwork,* the ALJ noted that the distinction was meaningful only in the context of "all the surrounding circumstances"—evidently, it was drawn to shed light on the practical purposes of work preservation boycotts.[53] He concluded after his analysis of all the relevant facts that "Hudik [was] only a means or instrumentality for exerting pressure against Slant/Fin and Austin with whom the Union has its primary dispute . . .."[54]

Third, the ALJ examined the circumstance most relevant to the instant case: the dearth of nonunion labor in New York City, site of the Norwegian project.[55]

**52.** *Id.* at 238; *see also* note 8 *supra.*

**53.** The significance of the distinction between "effective" and "ineffective" means of exerting pressure escapes the majority, which can only conclude that it is "absolutely *irrelevant*" to the issue of Hudik's neutrality. Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 892 n.9. But it is inaccurate to ascribe this view to the ALJ. He drew the dichotomy to demonstrate in bold relief the purpose of the Union's action, the bringing to bear of pressure on those parties who specified the use of prefabricated products, and thus to highlight Hudik's incidental role in the controversy. The statute requires proof that *an object* of an economic action be proved to be secondary, and so the ALJ turned to the most important single "surrounding circumstance," the balance of power in the New York construction industry, to find an absence of nonunion labor in that area, bolstering his belief that the Union's purpose was to influence the policies of Austin and Slant/Fin. A contrary finding that ample nonunion replacement labor rendered Hudik an ineffective means or instrumentality for pressuring parties to the Norwegian Home contract would have undermined his theory, for the motive and expectation he imputed to the Union would in that case have been unreasonable. His announcement that "in both situations" Hudik was just a "means or instrumentality" signalled that in either event Hudik was not the object of the Union's action, while the effective/ineffective distinction went to the validity of the conclusion that Austin and Slant/Fin were in fact such objects.

I sympathize with the majority's hesitancy concerning the use of the word "neutral," and concede that Hudik is not neutral in the sense that it is uninvolved with, or unaffected by, the instant dispute. The source of Hudik's legal neutrality is the fact that the Union in

these circumstances cannot *rationally* boycott Hudik to secure the right to perform internal piping on the heating and cooling units, without intending to pressure Austin and Slant/Fin, since only Austin and Slant/Fin are capable of acceding to the Union's demands. Thus Hudik is neutral with respect to the particular remedy of economic action which the Union invoked to redress its grievances. This line of reasoning does not confuse "objects" and "effects" of economic actions, as the majority fears, *see* Majority Op., 172 U.S.App. D.C. at ——, 521 F.2d at 900 n.36. Where secondary consequences are essential to the success of a strike, and are in fact the reason for its existence, the strike has a secondary object. *Cf.* note 78 *infra.*

**54.** J.A. 238.

**55.** This aspect of the ALJ's findings is an effective response to the argument that the Board may not generalize concerning the relative bargaining positions of sub- and general contractors, but must consider the surrounding circumstances of each individual labor dispute. While the ALJ relies—and must rely—in part on experience in assessing the ability of Hudik to influence Austin's prefabrication specifications, he examines the factors which might rebut his presumption that subcontractors cannot directly influence the decision of an engineer or general contractor to use prefabricated products. Contrary to the majority's insistence that it is virtually impossible to prove the absence of an imputed secondary objective, Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 890 n.9, the Board's review of circumstances determining the degree of a subcontractor's control may indicate an unequivocally primary purpose. Here, if unions did not control the labor supply in the New York construction industry, J.A. 239 n.10, or if

[I]t is an appropriate subject of official notice that in New York City and probably in all or most of the major cities in this country, the building and construction industry is unionized, certainly with respect to major industrial, commercial, and public construction.[56]

The ALJ asserted that the Norwegian Home was "in an area where there are no nonunion steamfitters available or no nonunion mechanical contractors; or, if either of the nonunion categories exist, neither Austin, the union general contractor and engineer, nor Hudik, the union subcontractor could or would see them."[57] Thus Hudik was an effective instrumentality for pressuring the "true 'culprits,'" and the parties with whom the Union has its dispute[:] Slant/Fin, who manufactures prepiped units, and Austin, who specified such units as the heating and cooling units for installation in the Norwegian Home."[58] Alternative union labor would not be available, for "in the construction industry it is the unions that control the labor supply and if the union steamfitter employees of Hudik on the Norwegian job refuse to work, other steamfitters will not be available to Hudik or to anyone else to perform work on the job."[59] The consequence of a Hudik boycott was clear:

If prepaid [prepiped] units cannot be installed in the large commercial, public, and industrial buildings in the New York area or in other areas effectively organized by the Union and other building trades unions, the manufacture[r] will be materially affected and Austin and other engineers and general contractors will not specify their purchase and use in buildings.[60]

Finally, the ALJ fit these factual parameters into the legal equation of sec-

tion 8(b)(4)(B) and concluded that the Union's dispute was not with the actions of Hudik, but rather with the labor policies that Austin enforced through its specifications and with the products distributed by Slant/Fin. Because Hudik was accorded a secondary role in the conflict, the boycott by the Union violated the Act's prohibition of economic action directed toward neutral employers.

### 3. *The Order of the Board*

The Labor Board affirmed "the rulings, findings, and conclusions of the Administrative Law Judge to the extent consistent" with its own brief Decision and Order, and adopted his recommendation that the Union be ordered to discontinue its boycott of Hudik. The Board's principal exception to the ALJ's findings was its refusal to rule, as he had, that economic actions directed against Austin and Slant/Fin would constitute lawful primary activity. It nevertheless concurred in his determination of Hudik's neutrality. To reinforce his conclusion that Austin was the true object of the boycott, the Board noted that

the Respondent informed Austin, who did not employ employees represented by the Respondent and had no agreement with that Union, that it would not let Hudik install the climate control units involved.[61]

The Board also articulated a point that was implicit in the findings of the ALJ, that the ultimate purpose of the Union's action was the preservation of work its member employees had traditionally performed. But the means adopted by the Union to achieve this goal offended the Act's proscription of secondary boycotts. "Since the pressure exerted by the Re-

Hudik were deemed an ineffective instrumentality of pressure on Austin, the analysis by the ALJ might well have yielded a contrary conclusion.

**56.** J.A. 239.

**57.** *Id.*

**58.** *Id.*

**59.** *Id.* n.10.

**60.** *Id.*

**61.** *Id.* at 254.

spondent on Hudik was undertaken for its effect on other neutral employers, this pressure was secondary and prohibited by Section 8(b)(4)(B)." [62]

## B. The Significance of "Control"

The unrealistic, undimensional *per se* control test the majority discredits is a straw man. The Board does not employ a *per se* formulation, which might well violate the stricture of *National Woodwork* that the focus of a union's action must be determined from all the surrounding circumstances; instead, the Board relies on a *prima facie* standard. By this test, a union may not boycott an employer who lacks the right to control the assignment of disputed work, *provided* that the employer has not voluntarily relinquished that control.[63] The redeeming feature of this criterion is that it permits and even mandates the conclusion that the union acted properly in launching an economic action whenever "the employer's loss of power to assign the work is the result of his own efforts to instigate the subcontracting to another of work subject to his work preservation agreement with the union" [64]—in

the majority's parlance, whenever he "binds his own hands." In such a case the employer would cease to be neutral, and would be termed "offending" by virtue of his voluntary action surrendering legal control of the disputed work.

The situation which the Board contemplates would shift responsibility for the dispute to the employer is precisely that of *National Woodwork*. Discretion in the specification of prefitted doors rested with Frouge, the general contractor.[65] His unilateral decision to use premachined rather than "blank" doors prompted the Union's boycott. By contrast, here the specification of prepiped climate control units was fixed by a provision of the contract on which Hudik bid.

That the factual differences between *National Woodwork* and this case are sufficient to justify the legal distinction the Board urges is suggested by the ALJ's conclusion that Hudik's alternatives were either to bid on the Norwegian Home contract in spite of the contractual conflict or to have insufficient work for its employees.[66] The Board had

---

62. *Id.*

63. Brief for the NLRB at 5 n.4; *see also Painters District Council No. 20,* 185 NLRB 930, 932 (1970); *Local 120, Plumbers & Pipefitters,* 168 NLRB 991, 992 (1967).

64. *Id.*

65. *See* notes 46 & 47 *supra.*

66. The majority argues that "for all relevant analytical purposes the situation of the . . . employers [in this case and in *National Woodwork*] is identical." Majority Op., 172 U.S. App.D.C. at ——, 521 F.2d at 896 n.25. One of the parallels drawn to support this contention is the claim that in both cases "the employer could comply with the union's demands *before* breaking the contract." *Id.* We deem it a relevant analytical distinction that in *National Woodwork,* Frouge, the general contractor and the target of the strike at issue, was able to comply with the union's demands and simultaneously continue work on the project, while Hudik could comply only by declining to bid for Austin's subcontract or for that of any other general contractor intent on utilizing prefabricated goods.

The realism of this approach lies in its recognition that an employer who simply bids on a contract with specifications which conflict with his own work preservation agreement is not truly "offending": the economics and practicalities of his occupation leave him little choice. In these circumstances he is a neutral caught between the union on one side and the general contractor and manufacturer on the other.

The majority suggests as another alternative that Hudik and other subcontractors similarly situated should by prior arrangement offer their employees compensation for traditional work which cannot be performed at jobsite. The short answer to this proposal is that it is not necessary: if the work preservation agreement at issue is construed to reserve to the union all traditional work and not simply that over which the employer has control, then a contractual right to damages enforceable by lawsuit may have accrued to the union. Adjustment by prior arrangement is a desirable solution, but where by ignorance or design an employer enters a contract which denies him the right to preserve traditional work for his employees, judicial enforcement is an established remedy clearly preferable to economic action which violates § 8(b)(4).

expert knowledge of the competing forces within the construction industry—perhaps the exclusive domain of the complex and contradictory subcontracting practices we consider here.[67] The wiser course is to recognize and respect the distinction the Board observes between "offending" employers—most commonly, engineers and general contractors—who actively and by choice assign traditional unit work in derogation of work preservation agreements, and "unoffending" subcontractors who enter into contracts with prefabrication specifications rather than pursue the economically disastrous course of declining to bid on such contracts.[68]

The legal consequence of this distinction is the classification of subcontractors like Hudik who enter contracts with specifications contrary to their work preservation agreements as neutral employers. The majority rejects as inherently sophistical the notion that such employers can ever be termed neutral: in their eyes Hudik, for example, has actively violated an understanding for which the Union bargained collectively, and the Union's dispute is clearly with Hudik.[69] But the Labor Board takes a more refined and realistic view of the situation. The Board insists that the Union's true complaint is with the predilection of architects, engineers and general contractors for factory-designed and -assembled goods. The Board need not consider the encroachment of modern technology, the relative advantages and disadvantages of prefabricated products, or the economic arguments which the *National Woodwork* Court ignored [70]; it simply recognizes as one factor influencing its decision that the policy of using prefabricated goods, and the power to compel their use, belong to the general contractor and not to the subcontractor.[71] Thus the Union's dispute cannot

67. The Board treats the right-to-control test as a standard applicable to the construction industry, and none of the parties cites a case in which the test was applied in a different context.

68. *Compare Local 636, United Association, and Mechanical Contractors of Detroit,* 177 NLRB 189, 190 (1969) *with Painters District Council No. 20,* 185 NLRB 930, 932 (1970); *and Local 438, Plumbers and Pipefitters,* 201 NLRB 59, *enforced, George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973), *with Local 120, Plumbers & Pipefitters,* 168 NLRB 991, 992 (1967).

69. Majority Op., 172 U.S.App.D.C. at —, —, —, —, 521 F.2d at 894, 898 n.33, 899 n.34, 900. *But see* the statement of the *National Woodwork* Court that Frouge, the immediate employer of the boycotting employees in that case, would become a neutral, in spite of his voluntary violation of a valid work preservation clause, if the boycott were "tactically calculated to satisfy union objectives elsewhere." 386 U.S. at 644–45, 87 S.Ct. at 1268.

70. Both Justice Brennan's majority opinion and Justice Harlan's concurring memorandum in *National Woodwork* cautioned against judicial interpretations of the NLRA strained to comport with personal economic convictions. Justice Brennan volunteered that "economic and technological factors" militating against "will not handle" clauses "in all circumstanc-

es" should be considered by Congress, but insisted that "Congress' policy has not yet moved to this point . . .." 386 U.S. at 644, 87 S.Ct. at 1268. Mindful of the Court's pronouncement, I do not argue that the law should be tailored to suit protean economic conditions, but only that the structure, customs and economics of a particular trade or industry may help to define the purpose of actions taken by parties to a labor dispute.

71. The majority ignores a critical point which validates the Board's approach: the Board is looking not only at the locus of legal control over disputed work at the time charges are filed, nor only at the predicament of a particular employer and employee, but instead at the locus of power over design specifications in the construction industry in the New York area. Recognizing that the subcontractors who employ members of traditional craft unions lack meaningful input into decisions concerning project specifications, the Board refuses to penalize them for conflicts beyond their control, but does not hesitate to affix responsibility when they voluntarily reassign work which is subject to work preservation agreements. *See* cases cited at note 68 *supra.* The ALJ's construction of Rule IX of Hudik's collective bargaining agreement with Enterprise to apply only to work which Hudik had discretion to preserve is consonant with this approach. Absent his overview of subcontracting practices in the construction industry, the ALJ could not accurately ascertain an employer's ability to accede to union demands; with-

logically be solely with the subcontractor, but must instead be also with the party who dictates that prefabricated products shall be employed: the owner, the designer, the general contractor.

The right-to-control test would clearly be less palatable if "control" signified only immediate legal dominion or contractual power, as the majority suggests.[72] The term includes these factors, but in addition it denotes an employer's ability to effect changes in or exert influence upon the construction policies of those parties who specify the use of prefabricated products.[73] To this end the ALJ scrutinized not just the pro-

visions of Hudik's contracts with Austin and Enterprise, but more importantly Hudik's practical ability to satisfy Rule IX of its collective bargaining agreement by inducing or persuading Austin to allow jobsite piping of climate control units. The ALJ concluded that Hudik, though an effective instrumentality of pressure against Austin and other New York City engineers if it refrained from bidding, could exert little influence on the use of Slant/Fin products if it participated in construction of the Norwegian Home. As a typical craft subcontractor, Hudik lacked effective control over Austin's use of prepiped units.[74]

out this determination, his identification of the focus and purpose of the union's economic action would be more difficult.

To hold that the Board cannot generalize from its examination of particular factual situations, that it cannot adopt a rule based on the structure and custom of construction subcontracting, is to reject the benefits of administrative experience and expertise. Like the Supreme Court in *National Woodwork,* we are confronted with voluminous briefs of *amici* submitted to demonstrate that prefabrication specifications are both ubiquitous and essential—economically and functionally—to the construction of modern buildings. While it is intuitively evident that the meticulous requirements of specialized projects may at times compel the use of prefitted, prefabricated or factory-installed equipment, we cannot extrapolate from the data the *amici* submit any legal or factual principle concerning work preservation boycotts. But we may note that the Board's conclusion that general contractors and not subcontractors tend to exercise control over the specification of prefabricated products is not without record support. *See,* *e. g.,* cases cited at note 68 *supra.* And this conclusion inevitably influences the Board's decision as to whose labor policies a boycotting union is attempting to change. *Cf.* note 55 and accompanying text *supra.*

**72.** *See, e. g.,* Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 890 n.9. The majority depicts this opinion as a "smorgasbord," which it attempts to separate into three "possible explanations" of the Board's action. Instead what is offered, à la carte, is a solitary thesis: that the ALJ, in conformity with the *National Woodwork* mandate, applied to the circumstances of this dispute a *prima facie* right-to-control test, whereby an illegal secondary objective would be imputed to the Union if an examination of the surrounding cir-

cumstances revealed that the boycott was directed at a subcontractor who from the start lacked *legal and practical* control over the assignment of the disputed work.

**73.** Discussing the significance of economic interrelationship between the parties to a construction project, a panel of this court noted that "the factors on which the independent contractor finding rests demonstrate that one party does not exercise control over the other in significant respects." *Carpet Layers Local 419 v. NLRB,* 151 U.S.App.D.C. 338, 345, 467 F.2d 392, 399 (1972). In that case the inability of one contractor to control another was deemed relevant to the determination of secondary status for the purposes of section 8(b)(4). This broader sense of the term "control" is the usage and intendment of the Board in its right-to-control formulation, rather than the concept of immediate legal control which the majority assails.

**74.** The majority in its footnote 25 states that on remand the Board can examine the contractual relations of the parties to determine "not only the situation the pressured employer finds himself in but also how he came to be in that situation." This inquiry is one of the surrounding circumstances the Board is urged to consider in assessing innocence, neutrality, and primary status. The majority fails to recognize that the Board has already made precisely such a judgment, that it has determined, contrary to the views of the majority, that to deny subcontractors like Hudik the right to bid where such conflicts exist does in fact "unduly [tie] an employer's hands concerning managerial discretion." The Board has concluded that the subcontractor's hands are tied long before he bids on a general contract with provisions contrary to his work preservation agreement.

Significantly, if the only impediment to Hudik's ability to preserve work for its employees had been a contractual term, the ALJ's exami-

## C. *The Object of the Union's Boycott*

I recognize, as have both the majority and the ALJ, that as a class, as an intermediate echelon in the construction industry, subcontractors like Hudik do exert considerable influence over the use of prefabricated materials in construction projects. In footnote 25 the majority cites the ALJ's conclusion that "[i]f prepaid [sic] units cannot be installed * * Austin and other engineers and general contractors will not specify their purchase and use in buildings." [75] For the majority this pressure has an apparently salutary consequence: work preservation clauses "subserve its [Union's] legitimate end of ensuring that its members [can] continue to perform in the future the work they [have] traditionally performed in the past." [76] But by acknowledging that those work preservation boycotts against subcontractors have as their primary purpose—indeed, their only logical purpose [77]—the bringing to bear of pressure against engineers and general contractors responsible for prefabrication specifications, the majority undercuts the analytical framework of its opinion. The

majority concedes the effective neutrality of subcontractors like Hudik by admitting that the primary goal of work preservation boycotts against subcontractors is the effectuation of a change in design specifications for construction projects. [78]

Clearly section 8(b)(4)(B) represents a compromise, an accommodation between the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." [79] The majority would emphasize the Union interest in this balance, but explicit statutory language delimits the union's right to exert economic pressure at that point where *an object* of the action is forcing secondary employers to modify their labor policies and practices. The Supreme Court announced in *Denver Trades* [80] that "[i]t is not necessary to find that the *sole* object of the strike [is] that of forcing the contractor to terminate the subcontractor's con-

---

nation of the factual context of the labor dispute and his identification of the parties responsible for prefabrication specifications might nevertheless have led him to conclude that the Union was engaged in a primary boycott. If, for example, Austin's plans allowed Hudik the option of jobsite piping, any attempt to establish a dummy subcontracting scheme to absolve Hudik of responsibility for prefabrication specifications and to immunize it from boycotts would be frustrated at the outset by the Board's analysis. This legal fiction would not negate Hudik's practical ability to accede to its employees' bargaining demands and to meet the requirements of its collective bargaining agreement.

75. J.A. 239.

76. Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 896 n.25.

77. The majority notes the facial validity of the ALJ's conclusion that Hudik cannot preserve work by failing to bid on jobs and secure contracts, but explains that work preservation clauses are in fact efficacious when enforced in concert, since engineers and general contractors will ultimately be forced to eschew prefabrication specifications in order to secure bids from subcontractors.

78. A fine distinction may exist between the secondary *objects* which the statute proscribes and secondary *effects* of primary action, which the case law tolerates. *See, e. g., NLRB v. Local 825, Operating Engineers,* 400 U.S. 297, 304–05, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *Steelworkers (Carrier) v. NLRB,* 376 U.S. 492, 496, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); *Electrical Workers (General Electric) v. NLRB,* 366 U.S. 667, 682, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961). Because the ALJ and the majority both recognize that Enterprise's enforcement of its work preservation agreement against Hudik makes sense only if concomitant pressures are exerted on Austin, I have no difficulty concluding that those pressures are an object and not just an ancillary consequence of the Union's action. *Cf. Local 636, Plumbers & Pipefitters v. NLRB,* 139 U.S.App.D.C. 165, 430 F.2d 906 (1970).

79. *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951); *see also National Woodwork,* 386 U.S. at 626–27, 87 S.Ct. 1250; Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 894.

80. *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

tract." [81] This court has also embraced the view that a violation of section 8(b)(4) is established if *"an* objective of the union's secondary action, although *not necessarily the only objective,* is to force the secondary employer to cease doing business with the primary employer." [82] And the *National Woodwork* decision has not altered the balance between permissible primary and prohibited secondary activity. Thus the fact that Enterprise had as one object of its boycott the enforcement of its legitimate work preservation agreement with Hudik does not exculpate the union of 8(b)(4) charges if another object of the action was the application of pressure to Austin to prevent the use of prepiped Slant/Fin units. [83]

The majority skirts the effect of the inclusive language of section 8(b)(4)(B) by insisting that the provision cannot in all reason be construed to preclude enforcement of a valid collective bargaining agreement. But we have been cautioned not to expand the Union's right to strike beyond the limits prescribed by the Act. The principle that "a violation of the secondary boycott provisions cannot be justified by a contractual arrangement between the union and the neutral employer" [84] dates to the Supreme Court's 1958 *Sand Door* decision. [85] There the Court recognized that a union might be left with a valid contractual provision and with no means of enforcing it other than in a civil suit. [86] The majority position is largely premised on the legitimacy of the Union's work preservation goal, [87] but this court has given

---

**81.** 341 U.S. at 689, 71 S.Ct. at 952 (emphasis in original). Senator Taft, sponsor of the bill which included the original section 8(b)(4), highlighted the significance of the statutory language in his supplementary analysis:

> Section 8(b)(4), relating to illegal strikes and boycotts, was amended in conference by striking out the words "for the purpose of" and inserting the clause "where an object thereof is." Obviously the intent of the conferees was to close any loophole which would prevent the Board from being blocked in giving relief against such illegal activities simply because one of the purposes of such strikes might have been lawful.

93 Cong.Rec. 6859, II 1947 Leg.Hist. 1623. The Supreme Court reiterated the importance of this statement in *IBEW v. NLRB,* 341 U.S. 694, 700, 71 S.Ct. 954, 957, 95 L.Ed. 1299 (1951): "[I]t was sufficient that *an* objective of the [union action], although *not necessarily the only* objective" is to cause a secondary employer to cease doing business with another person. (Emphasis in original.)

**82.** *Carpet Layers Local 419 v. NLRB,* 151 U.S. App.D.C. 338, 345 n.13, 467 F.2d 392, 399 n.13 (1972) (emphasis in original).

**83.** Though the ALJ did not articulate this precise conclusion, his determination that the work preservation boycott could only achieve its purpose if it resulted in a modification of the general contractor's project specifications is a functional equivalent.

**84.** *NLRB v. Carpenters, District Council of New Orleans,* 407 F.2d 804, 806 (5th Cir. 1969); *Associated General Contractors of California, Inc. v. NLRB,* 514 F.2d 433 (9th Cir.

1975); *ACCO Construction Equipment, Inc. v. NLRB,* 511 F.2d 848 (9th Cir. 1975); *NLRB v. International Board of Electrical Workers,* 405 F.2d 159 (9th Cir. 1968); *see also Ohio Valley Carpenters District Council v. NLRB,* 339 F.2d 142, 145 (6th Cir. 1964) ("a legal contract does not immunize illegal action employed for its enforcement"); *cf. Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 104, 321 F.2d 366, 370, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963) ("regardless of the legitimacy of the end sought by the union, it cannot engage in secondary pressure to obtain it").

**85.** *Local 1976, Carpenters & Joiners v. NLRB,* 357 U.S. 93, 105, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

**86.** *Id.* 357 U.S. at 107–08, 78 S.Ct. 1011; *see Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 104, 321 F.2d 366, 370, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963).

**87.** The standard employed by the majority is even more monolithic and unrealistic than the majority's characterization of the Board's right-to-control test. For the majority the sole determinant of employer liability to economic action is the existence of a work preservation agreement. This assumption suggests that by acquiring pacts, agreements and contractual provisions, explicit or implicit, which guarantee work to the union, the union is able to immunize itself from liability for economic actions. The equation is, contractual provision plus violation equals legitimate strike. But a realistic appraisal of the construction industry defies this simplistic analysis. Work preservation agreements for crafts are ubiquitous; if

unequivocal support to the almost tautological view that legitimate ends may not be pursued by unlawful means.[88] Where the valid goal of compelling compliance with a contractual provision combines with the unlawful object of pressuring neutral or secondary employers to achieve that goal, the statute will not permit a union to engage in economic action.

Analysis of the object of economic action taken to enforce a contractual provision would be strained if the purpose of the provision itself were not considered. The *National Woodwork* Court noted that union economic activity enforcing contractual provisions was prohibited where "*the agreements and boycott* were tactically calculated to satisfy union objectives elsewhere."[89] The Court's awareness that admittedly valid contractual clauses may have secondary objects and that their enforcement may offend the Act's ban on secondary pressures recalls an observation of the *Sand Door* Court:

> The realities of coercion are not altered simply because it is said that the employer is forced to carry out a prior engagement rather than forced now to cease doing business with another. A more important consideration, and one *peculiarly within the cognizance of the Board . . .* is the possibility that the contractual provision itself may well not have been the result of choice on the employer's part free from the kind of coercion Congress has condemned. [T]o allow the union to invoke the provision to justify conduct that in the absence of such a provision would be a violation of the statute might give it the means to transmit to the moment of boycott, through the contract, the very pressures from which Congress has determined to relieve secondary employers.[90]

Partly in response to *Sand Door*,[91] Congress enacted section 8(e) to prohibit even the execution of "hot cargo" clauses.[92] The *proviso* permitting "hot cargo" agreements for jobsite construction work, included "because of the close community of interests there,"[93] was intended to reduce periodic strikes and boycotts occasioned by the peculiar circumstances of the construction industry.[94] Thus, although Congress and

---

each can be enforced by economic action, regardless of secondary effects, product boycotts will be validated wholesale and unions will effectively dictate both which projects their employers can undertake and what the details and specifications of the projects will be. Thus to look solely to the existence of a work preservation agreement or understanding, without examining the particulars of its creation and reasonable scope, is to adhere to a unitary and impractical standard in the manner which the majority explicitly disapproves. At the least, the Board's formula is the product of and reflects intimate familiarity with the vertical organization of craft unions, the forces prompting their proliferation, and the complex matrix of hot cargo, union signatory and work preservation clauses surrounding construction projects, a web commonly weaved to lend all strikes and boycotts the dignity of primary action.

88. *Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 321 F.2d 366, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963); *and see* note 78 *supra.*

89. 386 U.S. at 644–45, 87 S.Ct. 1250 (emphasis added).

90. 357 U.S. at 106, 78 S.Ct. at 1019 (emphasis added).

91. The case held that while a union could not strike to enforce an employer's agreement not to handle nonunion goods, voluntary adoption and observance of such a condition was not prohibited by section 8(b)(4)(A).

92. 386 U.S. at 634–35, 87 S.Ct. 1250.

93. *Id.* at 639, 87 S.Ct. at 1265.

94. Elucidating its conclusion that the *proviso* was prompted by the "close community of interests" on the jobsite, the *National Woodwork* Court cited the Third Circuit's opinion in *Essex County v. NLRB,* 332 F.2d 636 (1964), where the following explanation is offered:

> This limited exception was granted apparently in recognition of the problems peculiar to the construction industry, particularly those resulting from sporadic work stoppages occasioned by the traditional refusal of craft unionists to work alongside non-union men on the same project. The exemption does not extend to other agreements such as those relating to subcontracts for supplies and materials to be transported to and delivered on the construction site.

the Court have sanctioned particularly restrictive clauses in the context of job-site construction work since the *Sand Door* decision, the Court is no less suspicious of clauses negotiated and enforced to serve secondary purposes, simply because they appear in construction contracts. Here the Board, with its unique perspective on labor practices and pressures, has considered the relative individual and institutional strengths of the contracting parties, the practical purposes of work preservation clauses, and the realistic effect of the Union's economic action. After consideration of all these factors the Board has determined that Enterprise's enforcement of its work preservation clause against Hudik has a substantial secondary object and secondary effects of impermissible magnitude, and has concluded that the Union's boycott violates section 8(b)(4)(B). The means by which the Board reached this result satisfy the requirements of the statute and the case law, including *National Woodwork:* the *prima facie* right-to-control test rests on the Board's considered judgment that a subcontractor's inability to affect or avoid prefabrication specifications in general contracts renders him an inappropriate and impermissible target of union economic activity. The majority has not shown an adequate basis for upsetting that decision.

### D. The Union's Alternative Remedies

The majority disapproves the Board's result as well as its analysis, suggesting that the NLRB is not empowered to define the arsenal of economic weapons each party to a labor dispute may use.[95] This challenge is more plausible, for it is the basis on which the *National Woodwork* Court indicated it would have considered the test, had the issue been presented in that case.[96] But since the Board's decision rests on its interpretation of section 8(b)(4) and not on an equitable attempt to fashion bargaining parity, its result satisfies the guidelines set forth by the Supreme Court in *NLRB v. Insurance Agents' International Union.*[97]

In *Insurance Agents* the Court rejected a distinction which the Board essayed, between the traditional "total strike" and concerted on-the-job harassment. The Board had concluded that the latter variety of economic action constituted a refusal to bargain collectively in violation of section 8(b)(3); the Court could find no basis for the Board's ruling within that statutory provision. Neither did the Act permit the Board's conclusion that the union's tactics—demonstrations, leafletting, and refusal to cooperate with company rules and policies—were beyond the protection of sections 7 and 8(a)(1) of

Cited at 386 U.S. 612, 639 n.32, 87 S.Ct. 1250. *See also Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).

**95.** At the close of its footnote 34 the majority insists that the Board is not authorized to function as an arbiter of the economic weapons respective parties may employ, in order to achieve and maintain what it deems a proper balance between the power of labor and management. This delimitation of Board authority is founded on specific language in *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 497–98, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). But nothing the Court or the Congress has said detracts from Board authority to proscribe the use of the economic weapon of a boycott where an object of the action is the bringing to bear of secondary pressures. To the contrary, judicial decision and legislative enactment give emphatic support to that prohibition and compel the Board to enforce the statutory stricture. When a legitimate contractual provision cannot be enforced by strike without a violation of section 8(b)(4), the Board is charged with removing that weapon from the union's arsenal and requiring the use of alternatives such as arbitration or lawsuit for breach of contract.

**96.** Not before us, therefore, is the issue argued by the AFL–CIO in its brief *amicus curiae*, namely, whether the Board's "right-to-control doctrine—that employees can never strike against their own employer about a matter over which he lacks the legal power to grant their demand"—is an incorrect rule of law inconsistent with the Court's decision in *Labor Board v. Insurance Agents' International Union, AFL–CIO*, 361 U.S. 477, 497–98 [80 S.Ct. 419, 431–432 (4 L.Ed.2d 454)]. 386 U.S. at 616 n.3, 87 S.Ct. at 1254.

**97.** 361 U.S. 477, 497–98, 80 S.Ct. 419 (1960).

the statute. Because of the "lack of relationship to the statutory standard inherent in" the Board's distinctions, the Court rejected them. Significantly, the Court observed that

> when the Board moves in this area, *with only § 8(b)(3) for support,* it is functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands.[98]

The right-to-control test has a legal as well as a factual component. The standard is predicated on the Board's determination that subcontractors who lack influence over project specifications cannot realistically be the targets of craft unions' work preservation boycotts and that union pressure in such instances is more logically considered to be aimed at general contractors and engineers who require the use of prefabricated products. When the Board examines the facts surrounding a particular work preservation dispute and concludes that the true object of the union's action is to force a change in the project designs of engineers and general contractors, it denies the union's right to enforce the work preservation clause in contravention of section 8(b)(4)(B). Clearly this scheme bears a close relation to the statutory standards of the National Labor Relations Act, for by factual determinations and legal conclusions well within its province the Board identifies and prohibits economic actions with secondary objects. This role is readily distinguishable from the one the Board assumed in *Insurance Agents*, where the line drawn between various species of concerted activity was not founded on specific statutory language.

Moreover, the notion that certain types of contractual provisions might be enforceable by lawsuit but not by economic action did not perish with the

*Sand Door* holding when Congress enacted section 8(e). In a remarkably lucid and unequivocal passage of legislative history the Conference Committee which submitted section 8(e) to the Congress announced that construction subcontracting agreements authorized by the *proviso* to section 8(e) should not be enforceable by strike or boycott:

> The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreements. Picketing to enforce such contracts would be illegal under the *Sand Door* case (*Local 1796, United Brotherhood of Carpenters v. NLRB* [357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186] (1958)). To the extent that such agreements are legal today under section 8(b)(4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e). The proviso applies only to section 8(e) and therefore leaves unaffected the law developed under section 8(b)(4). The *Denver Building Trades* case and the *Moore Drydock* cases would remain in full force and effect. The proviso is not intended to limit, change, or modify the present state of the law with respect to picketing at the site of a construction project.[99]

In *Orange Belt District Council of Painters, No. 48 v. NLRB,*[100] this court reasserted the *Sand Door* principle that economic actions enforcing certain valid contractual terms would violate section 8(b)(4). Speaking with reference to "union signatory" provisions, Judge Wright asserted that

---

**98.** *Id.* at 497, 80 S.Ct. at 431 (emphasis added).

**99.** H.Conf.Rep. No. 1147, 86th Cong., 1st Sess. 39 (1959), U.S.Code Cong. & Admin.News 1959, p. 2511.

**100.** 117 U.S.App.D.C. 233, 328 F.2d 534 (1964).

[s]econdary subcontracting clauses in the construction industry are lawful, under the *proviso* to Section 8(e), and economic force may be used to obtain them notwithstanding Section 8(b)(4)(A) . . . . But under Section 8(b)(4)(B) such secondary clauses may be enforced only through lawsuits, and not through economic action.[101]

The *National Woodwork* holding did not undermine this proposition; rather the Court determined that primary work preservation agreements properly enforceable under section 8(b)(4) were not prohibited by section 8(e).[102] This determination did not preclude the conclusion, reached by the Fourth Circuit in *George Koch*,[103] that work preservation agreements whose enforcement would be proscribed by section 8(b)(4) might nevertheless be valid under section 8(e), for the simple reason that a subcontractor's inability to cease using prefabricated products—his "lack of control over disputed work"—defeats a finding of "secondary pressures"[104] absent enforcement of the clause. This case presents that precise situation: the work preservation agreement between Hudik and Enterprise does not constitute a forbidden "agreement . . . whereby [the] employer . . . agrees to cease or refrain from handling . . . any of the products of any other employer . . .," according to the precept of *National Woodwork*, yet the Union cannot reasonably strike to enforce the provision without exerting secondary pressures prohibited by section 8(b)(4). The majority cites to Justice Stewart's dissenting view concerning the illogic of this position, but fails to recognize both the thrust of his argument[105] and the

---

101. *Id.* at 236, 328 F.2d at 537 (footnotes omitted). A year earlier, in *Local 5, Plumbers & Pipefitters v. NLRB,* 116 U.S.App.D.C. 100, 103, 321 F.2d 366, 369, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963), a panel of this court referred to two cases involving attempts to change purchasing policies of general contractors. The court observed:

> Both of these cases reflect a situation similar to the present one, for in both the union brought pressure on a subcontractor who was powerless to settle the dispute, as *Akron* here, in order to affect the purchasing policies of a general contractor. The only significant difference in this case is that the union attempted to influence the subcontracting policies of the general contractor, rather than its purchasing policies. There is nothing in the statute to indicate that this difference should produce a dissimilar result, for in both cases we have a secondary boycott.

(Footnote omitted.) This reasoning supports an analogy between union signatory and work preservation boycotts: both sorts of contract terms have been specifically validated (union signatory by enactment of the section 8(e) construction *proviso*, work preservation by *National Woodwork*), yet neither may be enforced where the subcontractor's lack of control demonstrates the union's action has a secondary object.

102. This determination is not the logical equivalent of the proposition the majority derives from *National Woodwork:* that work preservation is a valid primary purpose, that work preservation clauses therefore comply with section 8(e), and that their enforcement must satisfy section 8(b)(4). The more precise holding of the case is that section 8(b)(4) and section 8(e) do not prohibit primary activity directed to work preservation; primary activity is in turn defined as pressure levelled against an immediate employer because of some disagreement between boycotting employees and the boycotted employer. Where the Board determines that the operative dispute is in fact with a different employer and that the principal object of the boycott is to change that party's work policies, the work preservation shibboleth cannot render the economic action permissible under sections 8(b)(4) and 8(e).

103. *George Koch Sons, Inc. v. NLRB,* 490 F.2d 323 (4th Cir. 1973).

104. *Cf.* 386 U.S. at 638, 87 S.Ct. 1250.

105. Majority Op., 172 U.S.App.D.C. at ——, 521 F.2d at 901 n.38. Justice Stewart attempted to demonstrate that any contractual provision invalid under section 8(b)(4) when enforced should similarly be invalid under section 8(e), whose "sweep" he found to be coterminous with that of section 8(b)(4). Because he recognized that enforcement of work preservation provisions might violate section 8(b)(4)—in fact, in his opinion the statute condemned all product boycotts—he believed that under section 8(e) such provisions should not be permitted in collective bargaining agreements. The *National Woodwork* majority would not give so broad an interpretation to

fact that the Court's opinion in *National Woodwork* did in fact allow the possibility that section 8(b)(4) sweeps wider than section 8(e).[106]

The majority opinion conveys a sense that a work preservation clause would be valueless if it were not enforceable by economic action, and argues that surely the Union did not bargain for a nugatory contractual right. But the ALJ has suggested the function of such clauses: they insure that an employer who in fact has an opportunity to assign work traditionally performed by members of the union representing his employees will not voluntarily order prefabricated goods in derogation of the contract term. In fact the work preservation clause may be given greater impact. If the agreement is interpreted to apply to work beyond the control of the subcontractor at the time he signs the subcontract, he might agree to pay to the union in a contract suit the value of traditional work he cannot assign to his employees. Contrary to the majority's view that the burden of offering this compensation rests on the employer, the union should pursue an appropriate adjustment, resorting to judicial enforcement when

necessary. Neither the Supreme Court in *Sand Door* nor the Congress that enacted section 8(e) found the concept of enforcement by lawsuit to be disrespectful of employee or union interests. Without speculating over the wisdom—or necessity—of such contractual arrangements, we may note that employers gain considerable bidding flexibility by them, and that they promote resolution of work preservation disputes by an orderly legal process. By endorsing this scheme the Board does not "bail out" delinquent employers, but rather serves the legitimate end of contractually appointed work preservation without unnecessary and unlawful economic dislocations.

### E. *Conclusion*

Reduced to its essentials, this case questions the power of the Board (1) to decide that certain kinds of valid contractual provisions cannot be enforced by economic action without prohibited secondary effects and objects, and (2) to draw the line between permissible primary and unlawful secondary activity at the point where subcontractors employing members of particular craft unions

---

section 8(e). Because the majority's opinion left open the possibility that a clause whose enforcement would constitute secondary activity illegal under section 8(b)(4) might not be condemned under section 8(e), he offered this argument, to expand interpretation of section 8(e), not to constrict section 8(b)(4).

**106.** The Court concluded that Congress meant sections 8(e) and 8(b)(4)(B) to prohibit only "secondary" objectives, and that primary work preservation clauses were valid under both provisions of the Act. A subcontractor's work preservation agreement would clearly be primary if it were given the construction the ALJ placed on Rule IX of Hudik's collective bargaining agreement with Enterprise: the employer will preserve for the union all its traditional work which he has the ability to assign. This type of provision, innocuous by the standards of section 8(e), nevertheless clearly violates section 8(b)(4) when the union strikes for the right to perform work over which the employer has no effective control.

Even if the ALJ's interpretation of Rule IX is rejected, a work preservation agreement could satisfy section 8(e) but offend section

8(b)(4) if, for example, it were a lawful primary clause enforced against a neutral employer. *Cf.* 386 U.S. at 632, 87 S.Ct. at 1262: "In effect Congress, in enacting § 8(b)(4)(A) of the Act [the predecessor of the present section 8(b)(4)(B)], . . . barred as a secondary boycott union activity directed against a neutral employer, including the immediate employer when in fact the activity directed against him was carried on for its effect elsewhere." The Court noted in *National Woodwork* that the redrafting of the provision was intended to insure that lawful primary activity would remain legitimate under section 8(b)(4). But although the case validates the concept of primary work preservation, it does not sanction the full panoply of secondary means of enforcing work preservation clauses. Thus a clause which on its face did not constitute an "agreement . . . to cease or refrain from handling . . . any of the products of any other employer" according to the precept of *National Woodwork* might nevertheless by its enforcement reflect a secondary object of changing the labor policies of a neutral employer.

 941

lose meaningful control over conflicts between contracts and collective bargaining agreements. Though they did not address the problem in these precise terms, the circuits which considered the right-to-control test prior to *National Woodwork* upheld without dissent the Board's right to treat control over the assignment of disputed work as the discriminant of primary status.

*National Woodwork* is an inadequate justification for completely abandoning the logic of these earlier rulings. The decision constitutes a "delineation of that degree of proof which establishes a permissible primary boycott but falls short of evidencing the interdicted secondary boycott."[107] It asserts that a boycott tactically calculated to satisfy objectives elsewhere is prohibited secondary activity.[108] Thus a Board ruling that under all the surrounding circumstances Enterprise could only have sought to influence the labor policies of Austin, the general contractor, and Slant/Fin, the manufacturer, would seem to satisfy *National Woodwork's* definition of a section 8(b)(4) violation. Yet the majority balks at the Board's decision, in part because of its analysis ignores the ALJ's thorough discussion of relevant subcontracting practices in the New York City construction industry, and in part because it cannot allow a violation of a collective bargaining agreement to go unremedied by economic action. There may be some question whether Rule IX was in fact violated; there is little doubt that a strike to enforce the Union's literal construction of its terms has as its only logical purpose the exertion of pressure on Austin and other engineers and general contractors who specify the use of prefabricated products.

The majority is not compelled to consider the fact that the result it reaches strips subcontractors of opportunities to bid on projects with prefabrication specifications, divests designers and architects of meaningful control over the details of their projects, and simultaneously increases the costs of construction projects suited to pre-prepared components. But it should not fail to recognize that the boycott it sanctions is both a "sword" and a "shield,"[109] that Hudik is simultaneously a vehicle for exerting pressure on Austin, the party responsible for the use of prepiped climate control units, and a buffer, whose contractual obligation insulates Enterprise from legal responsibility for its secondary activity. Because I read *National Woodwork* to prohibit "offensive" economic actions serving secondary goals, and because to deny that Austin is the true object of the Union's boycott would be disingenuous, I respectfully dissent.

107. *George Koch Sons, Inc. v. NLRB*, 490 F.2d 323, 327 (4th Cir. 1973).

108. 386 U.S. at 644, 87 S.Ct. 1250.

109. *Cf. National Woodwork:*

It is arguable that Congress may have viewed the use of the boycott as a sword as different from labor's traditional concerns with wages, hours, and working conditions. But the boycott in the present cases was not used as a sword; it was a shield carried solely to preserve the members' jobs. 386 U.S. at 630, 87 S.Ct. at 1261.